GRIEVANCE COMMITTEE OF THE BAR OF FAIRFIELD COUNTY *v.* NORMAN F. DACEY ET AL.

KING, C. J., ALCORN, HOUSE, COTTER and RYAN, Js.

130

Argued June 7—decided July 19, 1966

*George A. Saden* and *Sturges N. Laros,* for the appellants (defendants).

*David Goldstein,* with whom were *Elaine S. Amendola,* and, on the brief, *Charles M. Needle* and *Lawrence W. Kanaga,* for the appellee (plaintiff).

KING, C. J. This action was brought by the Grievance Committee of the Bar of Fairfield County seeking an injunction to restrain the defendants

from engaging in the unauthorized practice of law in violation of General Statutes § 51-88.[1]

The defendants' attempts to secure additions to the finding are largely without merit. *Brown* v. *Connecticut Light & Power Co.*, 145 Conn. 290, 293, 141 A.2d 634. The same may be said of most of their attempts to secure deletions from the finding. With two exceptions, hereinafter discussed, the few changes to which the defendants have shown themselves entitled will be included, insofar as material, in the facts as stated.

The defendant Norman F. Dacey is the president, treasurer, and principal stockholder of the corporate defendant, Norman F. Dacey and Associates, Inc. In this action, no distinction has been made between the individual defendant and the corporate

[1] "Sec. 51-88. PRACTICE OF LAW BY PERSONS NOT ATTORNEYS. No person who has not been admitted as an attorney under the provisions of section 51-80 shall practice law or appear as an attorney at law or as attorney and counselor at law for another, in any court of record in this state, or make it a business to practice law, or appear as an attorney and counselor at law for another in any such court, or make it a business to solicit employment for a lawyer, or hold himself out to the public as being entitled to practice law, or assume to be an attorney or counselor at law, or assume, use or advertise the title of lawyer, or attorney and counselor at law, or attorney at law, or counselor at law, or attorney or counselor or attorney and counselor or equivalent terms, in such manner as to convey the impression that he is a legal practitioner of law or in any manner advertise that he, either alone or together with any other person or persons, owns, conducts or maintains a law office, or office or place of business of any kind for the practice of law. Any person who violates any provision of this section shall be fined not more than two hundred and fifty dollars or imprisoned not more than two months or both. Any person who violates any provision of this section shall be deemed in contempt of court, and the superior court shall have jurisdiction in equity upon the petition of any member of the bar of this state in good standing or upon its own motion to restrain such violation. Nothing herein contained shall be construed as prohibiting a town clerk from preparing or drawing deeds, mortgages, releases, certificates of change of name and

defendant, and for convenience the individual defendant, only, will hereinafter be mentioned.[2]

Dacey's principal business is that of a dealer in the sale of shares in mutual funds, including one known as the Wellington Fund. Dacey also engages in what he terms estate planning, which largely involves his giving advice as to investments and life insurance and does not necessarily involve the sale of shares in the Wellington Fund or in any other mutual fund or the preparation of any will or trust. But if a discussion with a customer as to his financial circumstances reveals that his assets are sufficient to warrant the creation of a trust, Dacey provides him with a thirty-page booklet entitled "A Modern Plan For Your Tomorrows" with the subtitle "An Explanation of the Dacey Trust". The first six pages of the booklet contain general information about the history and use of inter vivos and testamentary trusts, together with some tax information. The balance of the booklet contains a detailed description of the Dacey trust arrangement, consisting of the Dacey trust and the Dacey will, and of the claimed unique advantages of the trust arrangement. Also included are a form for drafting a Dacey trust, a form for drafting an implementing declaration of trust and a form for drafting a Dacey will. In other words, the last

trade name certificates which are to be recorded or filed in the town clerk's office in the town in which such town clerk resides or as prohibiting any person from practicing law or pleading at the bar of any court of this state in his own cause."

[2] Of course it is settled law that a corporation cannot practice law. *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 234, 140 A.2d 863. And this is true even though it acts through attorneys who are themselves members of the bar. Id., 235; see also General Statutes § 51-88; Canons of Professional Ethics, No. 35, Practice Book, p. 13.

twenty-four pages of the booklet do not contain mere general information but information focused specifically on the Dacey trust arrangement and its component parts, the Dacey trust and the Dacey will, and also, inter alia, information as to the tax consequences flowing from the use of the trust arrangement. The Dacey trust form, as set out in the booklet, is a revocable, inter vivos trust, and the corpus of the trust is usually composed initially of life insurance policies. The record indicates that in connection with the execution of a Dacey trust, the client (and in some cases his wife) usually, if not always, executes a will also. The trust and the will basically follow the trust and will forms in the booklet.

When, after reading the booklet and after conferring with Dacey, a client decides that he wants a Dacey trust, he informs Dacey of the manner in which he wishes his property to be distributed after his death. Thereafter, Dacey supplies a will and a trust, respectively patterned, in general, after the will form and the trust form in the booklet, prepares them by filling in the blanks, and supervises their execution.[3] In some instances, as disclosed by the exhibits, Dacey supplied instruments which materially deviated from the forms in the booklet. Although the booklet stated that the forms contained therein were "for the guidance of your attorney", so far as this record indicates, none of Dacey's customers consulted an attorney in connection with the preparation and execution of these wills and trusts, nor did Dacey urge them so

---

[3] In the case of the will, it was admitted that no printed form was filled out and that each will was typewritten throughout. But for reasons hereinafter stated, whether printed forms were or were not used is, under the circumstances of this case, immaterial.

to do. In some instances, Dacey orally supplemented the advice in the booklet as to the tax consequences of the use of these instruments. See note, 9 A.L.R.2d 797.

Although it did not clearly appear that Dacey ever charged for the preparation of a trust or will, as such, he did provide in the will form that upon the death of the testator the entire estate, except for tangible personal property, should go into the corpus of the trust and that substantially the entire corpus should be invested in shares of the Wellington Fund which should be purchased from Dacey. Under his contract with the Wellington Fund, Dacey received a 6 percent commission on all sales of shares of the Wellington Fund. Thus, as a direct consequence of his preparation of the Dacey trust arrangement, Dacey virtually assured himself of what amounted to a 6 percent sales commission on almost the entire assets of each estate. Compensation may have been frequently deferred, but it was substantial when received. The court found that the money involved in the trust arrangements prepared by Dacey amounted to several million dollars. On most, if not all, of this sum, he would receive a 6 percent commission.

Thus, this case does not involve any problem as to whether the absence of any compensation whatsoever for the preparation of a legal instrument has any bearing on whether its preparation constitutes the practice of law under our statute. The wills and trusts here were certainly not prepared "as a favor to a friend." See *Grievance Committee* v. *Payne,* 128 Conn. 325, 329, 22 A.2d 623.

Nor does this case involve any problem as to whether the preparation of a single will or trust, as an isolated occurrence, would constitute the prac-

tice of law in violation of our statute. Here, even
on the statement in his own brief as to the extent
of his activities, Dacey has prepared sixty-five or
seventy trusts or wills over a span of thirteen or
fourteen years.

With this preliminary statement of the basic
facts, we turn to the defendant's principal claims.
Further facts will be given where it appears neces-
sary for an understanding of these claims.

## I

### (a)

One basic claim of the defendant is that a proper
construction of § 51-88 of the General Statutes
would require that where, as here, there is no claim
that Dacey was practicing law in the courts, a
violation of the statute can be established only if
there is proof that he made it a business to prac-
tice law; and that, since the court made no con-
clusion to this effect, the ultimate conclusion that
he violated the statute is thus left without support.
The defendant claims that the presence of the
comma in § 51-88 before "in any court of record
in this state" shows that the quoted phrase modifies
both "practice law" and "appear as an attorney".
From this contention, he argues that the statute
prohibits the practice of law only in the courts,
and that the practice of law outside the courts is
prohibited only if it is conducted as a business.
Superficially, and as a mere matter of punctuation,
this claim seems to have some merit. But it is
clearly contrary to the holdings in *Grievance Com-
mittee* v. *Payne,* supra, 330, and in *State Bar Assn.*
v. *Connecticut Bank & Trust Co.,* 145 Conn. 222,
233, 140 A.2d 863. It is also completely refuted,

as hereinafter more particularly set forth, by the statutory history and evolution of what is now General Statutes § 51-88.

Until the enactment of chapter 159 of the 1927 Public Acts, the only statute forbidding the practice of law by persons not admitted to the bar was § 5461 of the 1918 Revision of the General Statutes, which provided that the Superior Court should admit as attorneys persons found qualified according to rules adopted by the judges of that court and further provided that "no other person than an attorney, so admitted, shall plead at the bar of any court of this state, except in his own cause." Literally, at least, this statute did not forbid the practice of law outside the courts.

The 1927 act did not amend or repeal § 5461, so that the prohibition in that section was left in full effect. But the 1927 act did provide, in material part, that "[n]o person who has not been admitted as an attorney by the superior court under the provisions of section 5461 of the general statutes shall practice or appear as an attorney at law or as attorney and counselor at law for another, in any court of record in this state, or make it a business to practice, as an attorney at law, or as an attorney and counselor at law for another in any such court".

It is obvious that the 1927 act fell short of being a model of good draftsmanship. For one thing, the first portion added little if anything to § 5461 so far as practice in court was concerned and therefore was repetitious of § 5461. The 1927 act forbade practicing in the court, as well as making it a business to practice, as an attorney at law or as attorney and counselor at law for another in any court of record in this state. Although, as hereinafter pointed out, the second provision is not

involved in this case, it was apparently inserted, out of an abundance of caution, to prohibit a person from making it a business to practice in a court even though, for lack of clients or other cause, he did not actually engage in practice in court. The defendant has seized upon this second provision, as it now appears in General Statutes § 51-88, in support of the claim now under discussion.

In the 1930 Revision of the General Statutes, § 5461 of the 1918 Revision was included, without change, as § 5343, while the 1927 act, without change, became § 5345.

In 1933, § 5343 was amended by inserting the words *"practice law or"* before "plead at the bar of any court of this state," so that the section, as amended, provided that "no other person than an attorney, so admitted, shall *practice law or* plead at the bar of any court of this state." Cum. Sup. 1933, § 1128b (Cum. Sup. 1935, § 1627c). Section 5345 was similarly amended. Cum. Sup. 1933, § 1129b (Cum. Sup. 1935, § 1628c).

There would have been no purpose in the 1933 amendment to § 5343, or to § 5345, if the defendant's present contention were sound. The addition of *"practice law or"* to § 5343 was meaningless if it was to refer only to court activities. One could hardly practice law in a court without pleading at the bar of that court. Nor is there any difference between practice in a court and the practice of law in a court. Thus, the 1933 amendment to § 5345, under the defendant's theory, would add nothing to that section. Certainly one does not practice anything but law in a court. An amendment is not to be rendered inefficacious or meaningless merely because a comma was carried over from the statute as it stood prior to the amendment. See cases

such as *Kubis* v. *Cornwall,* 95 Conn. 720, 723, 112 A. 663.

The vital point in each of the 1933 amendments is that the prohibition was clearly made applicable to the practice of law, although, apparently out of an abundance of caution, the appearance for another in any court of the state was also prohibited. This change in each section, and its effect, was noted in *Grievance Committee* v. *Payne,* 128 Conn. 325, 330, 22 A.2d 623. Whatever might have been the case prior to the 1933 amendments, after their effective date the practice of law, in or out of court, was clearly forbidden except in the case of persons admitted to the bar under § 5343 as amended. *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 233, 140 A.2d 863. Indeed, this was so, after the 1933 amendment to § 5343, even without resort to § 5345 or to the 1933 amendment thereto.

Subsequent statutory changes are of little importance in this case. The present provision for enforcement by equitable decree and by contempt proceedings was added to § 5345 by § 827d of the 1937 Supplement (Cum. Sup. 1939, § 1381e), and the present provision making a limited exemption for town clerks was added to § 5345 by § 721g of the 1943 Supplement, apparently as a result of the decision in the *Payne* case.

In the 1949 Revision of the General Statutes, § 5343, as amended in 1933, became § 7638, while § 5345, as amended in 1933, 1937 and 1943, became § 7641.

In the 1958 Revision of the General Statutes, § 7638 became § 51-80, while § 7641 became § 51-88. The redundancy in the prohibition against the practice of law in court in §§ 7638 and 7641 seems to have been detected by the revisers, who removed

from § 51-80 the prohibition against the practice of law which had been added in 1933, as well as the original prohibition against pleading at the bar of any court. The effect of this was to leave § 51-88 as the only statute prohibiting the practice of law in or out of court, but to incorporate into § 51-88 the prohibition against the practice of law in or out of court which the 1933 amendment had inserted in what was § 5343 of the 1930 Revision.

The defendant's claim that the practice of law, out of court, is not forbidden unless carried on as a business is without merit. The defendant was forbidden by § 51-88 to practice law in or out of court. This being so, it was of no consequence that the court did not include in its finding any conclusion that he made it a business to practice law. The only question is whether what he did constituted the practice of law. Whether he also could be said to have made it "a business to practice law" need not, on the facts of this case, be determined.

### (b)

One attack on the finding will now be separately considered. The defendant attacks the statements of the trial court, in many of its findings, that he "drafted" the wills and trusts involved in this case. Dacey claimed in his testimony that he "prepared" them. But there is little dispute as to what he actually did in connection with the wills and trusts. We are not here concerned with whether these acts constitute "drafting" or "preparing" but with whether they constituted the practice of law. See *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 236.

The question whether the mere filling in of blank forms and then supervising their execution consti-

tutes the practice of law has been a subject of some contrariety of decision, principally because of variations in the fact patterns and in the applicable statutes. See the cases collected in the annotations in 111 A.L.R. 19, 24 § IIIa; 125 A.L.R. 1173, 1175 § IIIa; 151 A.L.R. 781, 783 § IIIa; 53 A.L.R.2d 788, 807 § 5. Here, however, no such question arises since Dacey did far more than fill in blanks. Although he claimed that usually only the printed forms in the booklet were used, the court found that deviations from the printed forms were made in several instances, and this finding is supported by the exhibits in evidence. The determination that a given form should be followed without change is as much an exercise of legal judgment as is a determination that it should be changed in given particulars. In either case, legal judgment is used in the adaptation of the form to the specific needs and situation of the client. The claim that Dacey did no more than take an attestation to an otherwise already complete instrument, as a notary public might do, is so lacking in merit as to require no discussion.

The trust agreement for Malcolm C. Browne, for instance, included special provisions relating to continuing the operation of the Browne Construction Company and restricting the disposition of the settlor's stock in that company. The trusts for Herman and Ann Springer bear almost no resemblance to the form in the booklet. The wills of Nancy A. Gurney and Barbara S. Browne each contain an alternative provision in the event the husband of the testatrix predeceases her, although no such provision appears in the will form in the booklet, and each omits a provision in the booklet which avoids the statutory revocation of the will in

the event of the subsequent birth of a child. The defendant makes much of a finding that all of the instruments in evidence were copies of the forms in the booklet. This finding was erroneous and inconsistent with the finding as to deviations from the forms. The erroneous finding was apparently based on misleading and inaccurate testimony to that effect given at one point by Dacey. The exhibits themselves fully support the finding as to deviations and demonstrate that any testimony of Dacey to the contrary was inaccurate. From these facts it was not unreasonable for the trial court to conclude that Dacey, after consultation with the client, suggested what provisions should be included in the wills and trust agreements. There was no other reasonable way in which they could have been adapted, as they obviously were, to the particular client's needs and situation.

Thus, Dacey has done much more than merely to make available to his customers the trust form and the will form printed in the booklet. Not only was the trial court not in error in concluding that Dacey's acts in connection with the trusts and wills constituted the practice of law, but any other conclusion would have been wholly unreasonable.

### (c)

We turn now to the second basic attack on the finding. The defendant complains of numerous findings to the effect that he gave "advice" on the legal effect of the documents as executed and on their tax consequences. It is his claim that he gave only general information on these subjects as permitted by the rule of *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 226, 140 A.2d 863. In that case, the defendant banks did not give final

or specific advice, nor did they give their customers the terms to be incorporated in their wills and trusts. The first six pages of Dacey's booklet might perhaps fall within the classification of general information. The balance of the booklet was focused on the Dacey trust arrangement, including the Dacey trust and the Dacey will. This information was necessarily amplified in the oral discussions resulting in the preparation and execution of a will or trust adapted to the needs of the particular client.

Dacey himself sums up the true situation rather well on page 23 of his booklet, wherein he says that the "dealer [in mutual funds] may have rendered . . . [the client] invaluable service by bringing the advantages of this [Dacey] trust arrangement to his attention and by assisting him in adapting it to his needs. Most Settlors regard designation of the dealer in the trust [as the person from whom the trustee is to buy the mutual funds] as appropriate compensation."

In *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, the banks' customers were urged to consult their own attorneys for advice on their specific situations. There was no actual form of will or trust proposed to the customers as was the case here, nor did the banks prepare any trust or will for their customers' execution.

The booklet distributed by the defendant contained several statements that the forms therein were "for the guidance of your attorney," and thus clearly indicated Dacey's awareness that the adoption, adaptation, and execution of such instruments could be properly, and legally, done only by an attorney. Notwithstanding this awareness, however, Dacey prepared the instruments, in some

instances altering the forms, and supervised their execution, although the customers were not represented by attorneys. When the information given is directed toward a particular person and his needs and to a particular instrument prepared for his execution, it is no longer within the "general information" classification but has become legal advice embraced within the phrase "practice of law." That was the case here.

### (d)

The defendant seems to make some claim that the trust arrangement was merely incidental to his main business as an estate planner and salesman of shares in mutual funds, under the rule of *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 146 Conn. 556, 563 n.3, 153 A.2d 453. This claim is without merit. It is true that the Dacey trust arrangement was an excellent method of selling shares in mutual funds. Indeed, the commissions involved on the future sales of Wellington Fund shares to the trustees may well run to several hundred thousand dollars.

But the defendant cannot practice law as a method of selling mutual funds, any more than the banks, in the case he relies upon, could draft wills and trusts to augment the profits of their trust departments. The defendant's effort to escape the impact of the statute on the ground that his legal activities were incidental to his other businesses is wholly inefficacious. See *Oregon State Bar* v. *Miller,* 235 Ore. 341, 344, 385 P.2d 181.

### II

We pass now to two claims of unconstitutionality raised by this defendant.

## (a)

The first claim is that § 51-88 of the General Statutes is unconstitutional because of vagueness, under the rule of cases such as *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888.

One ground on which this claim is based is that in *Grievance Committee* v. *Payne,* 128 Conn. 325, 329, 22 A.2d 623, we said: "Attempts to define the practice of law have not been particularly successful. The reason for this is the broad field covered. The more practical approach is to consider each state of facts and determine whether it falls within the fair intendment of the term." The defendant claims this position means that the phrase "practice of law" has no exact, clear meaning and therefore lacks the specificity requisite in a penal statute. If this claim were true, and it is not, then a statute forbidding the practice of law, as distinguished from a statute forbidding an itemized list of specific acts falling within the common understanding of the term "practice of law", must necessarily be unconstitutional as to all persons.

As another ground of attack, the defendant has seized upon the statement in the *Payne* case (p. 330) that the statute, as amended in 1933, was intended to prohibit the performance of acts by persons not attorneys, in or out of court, "commonly understood to be the practice of law" and upon the carrying over of the quoted phrase into the opinion in the later case of *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 236, 140 A.2d 863. In other words, the defendant seems to claim that the statute does not merely prohibit the practice of law but, at least as construed by

this court, prohibits anything found to be "commonly understood to be the practice of law", and for that reason lacks the required specificity.

This argument is ingenious rather than persuasive. The quoted phrase was first used in the *Payne* case in pointing out that the statute, prior to the 1933 amendment, might be susceptible of a construction limiting its prohibitions to court appearances and activities; and that the effect of the 1933 amendment was to remove any doubt that the statute forbade, not merely practice in the courts, but "the performance of any acts by persons not admitted as attorneys, in or out of court, commonly understood to be the practice of law." *Grievance Committee* v. *Payne, supra,* 330.

The reasons and public policy obviously prompting the General Assembly to extend the statutory prohibition against the unauthorized practice of law to out-of-court activities, such as those engaged in by this defendant, are well set forth in *State Bar Assn.* v. *Connecticut Bank & Trust Co., supra,* 234, and need not be repeated.

Section 1-1 of the General Statutes provides that "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." See cases such as *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 474, 217 A.2d 698; *State* v. *Benson,* 153 Conn. 209, 214, 214 A.2d 903; *Baker* v. *Norwalk,* 152 Conn. 312, 315, 206 A.2d 428.

The use of the phrase "commonly understood to be the practice of law" was merely a shorthand

expression for incorporating into the term "practice of law" the rule of construction embodied in General Statutes § 1-1, previously quoted. It did not, as the defendant claims, inject any element of uncertainty into the statutory prohibition against the practice of law. It is the practice of law, whether in or out of court, which, in the case of one not admitted to the bar of this state, is proscribed by the statute.

It is true that because of the manifold activities which might be held included in the phrase "practice of law," an all-inclusive definition is difficult, if not impossible, of formulation. But there is and can be no question that the activities of Dacey, in the respects involved in this case, of preparing wills and trusts for particular members of the public, and of advising, as to the desirability in their circumstances, of the specific wills or trusts so prepared for them, constituted the practice of law within the obvious scope of the statute.

"It is, of course, true that due process requires that a penal statute 'be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' *Connally* v. *General Construction Co.,* 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322; *International Harvester Co.* v. *Kentucky,* 234 U.S. 216, 223, 34 S. Ct. 853, 58 L. Ed. 1284." *State* v. *Hurliman,* 143 Conn. 502, 509, 123 A.2d 767.

But "[i]t is fundamental that no one will be heard to question the constitutionality of a statute unless he is adversely affected by it." *State* v. *Hurliman,* supra, 506. The mere fact that some activities might be engaged in which would be so close to the border line that informed members of the bar might differ as to whether they did or did

not constitute the practice of law is of no assistance to this defendant. There is nothing to indicate that the particular legal activities which are involved in this case are of such a character that they are not clearly embraced in the phrase "practice of law." Consequently, the statute is not unconstitutionally ambiguous in its impact on the defendant. *Hardware Mutual Casualty Co.* v. *Premo,* supra, 471. His three basic activities which are adversely affected by the statute, and by the judgment, are, and always have been, commonly understood to be the practice of law. The claim of unconstitutionality for vagueness is, as to this defendant, without merit.

### (b)

A further claim of unconstitutionality is that the defendant's right of free speech, accorded under the first amendment to the federal constitution, has been illegally abridged in the scope or breadth of the terms of the injunction granted against him in this case. The specific claim of invalidity pursued in the defendant's brief is the prohibition in subdivision (a) of the injunctive provisions of the judgment against "advising and counseling any person concerning said documents, the effects thereof and the laws applicable thereto."

It is clear from a reading of the judgment that the words "said documents" refer to "wills, trusts, trust agreements and similar documents" which the defendant has prepared for individual clients. This is a very limited injunction and in nowise deprives the defendant of any rights, whether constitutionally protected or not, to which he could reasonably claim to be entitled. It also achieves the degree of specificity required in an injunction

under cases such as *Labbadia* v. *Bailey,* 147 Conn. 82, 86, 157 A.2d 237, and cases cited.

We find nothing in *Brotherhood of Railway Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 84 S. Ct. 1113, 12 L. Ed. 2d 89, in any way supporting the claims of the defendant in this or any other aspect of this case.

## III

There remain for consideration certain rulings on evidence.

### (a)

The plaintiff called as witnesses Irwin Mott, Miller Wachs, Jeram Kamlani, William G. Short and William Tumath. Each testified that he had executed a will form or trust form or both supplied by the defendant and that he had consulted no attorney in connection with the instruments so executed.

On cross-examination by the defendant's counsel, each witness, after testifying that the instrument was still in existence, was asked whether he was satisfied with the instrument and whether he felt that he had suffered any injury at Dacey's hands. Each question was excluded upon objection by the plaintiff's counsel, who gave no reason for the objection. The defendant's counsel claimed each question on the ground that the complaint alleged an injury to the public as a result of the defendant's unauthorized practice of law, that the burden of proof of this allegation was on the plaintiff, and that the questions were admissible to negate that allegation.

In the first place the questions were irrelevant. The complaint alleged an injury to the public, not

from the fact that Dacey had practiced law in an incompetent manner or to the particular injury of his clients, but from the fact that he had practiced law without having satisfied the uniform, standard, requirements for admission to the bar imposed for the benefit and protection of the public by what is now § 51-80 of the General Statutes. One satisfactorily meeting these requirements, and admitted to the bar, is presumed to be competent to practice law, including practice such as that carried on by Dacey and forming the subject matter of this case. Nor is this all. Quite apart from any consideration of relevancy, the questions were properly excluded, for the reasons hereinafter set forth, under the general rules governing the examination of witnesses.

A ruling on evidence must be tested by the finding. If it is claimed to be erroneous, the finding must contain facts sufficient to disclose the error. Practice Book § 648; *Morgillo* v. *Evergreen Cemetery Assn.,* 152 Conn. 169, 175, 205 A.2d 368; *Duncan* v. *Milford Savings Bank,* 134 Conn. 395, 403, 58 A.2d 260. And the finding must also disclose facts from which the materiality of the ruling may be determined. *Casalo* v. *Claro,* 147 Conn. 625, 630, 165 A.2d 153. As far as appears in the finding, the direct examination of the witnesses had not touched upon their satisfaction with the instruments which they had executed in Dacey's office or whether they had suffered injury as a result of these instruments. *Duncan* v. *Milford Savings Bank,* supra. Under settled Connecticut law, the scope of the cross-examination, where, as here, there is no attack on the credibility, as such, of the witness, is limited by the scope of the direct examination. *Mendez* v. *Dorman,* 151 Conn. 193, 198, 195 A.2d 561, and cases

cited. The scope of that examination could not be enlarged or otherwise affected by the allegations of the complaint.

If the defendant wished to extend his examination beyond the scope of the matters covered in the direct examination, he should have made the witness his own. *Finch* v. *Weiner,* 109 Conn. 616, 619, 145 A. 31. And the evidence should have been offered in an orderly way in the course of the defendant's own case. Ibid.; *Shulman* v. *Shulman,* 150 Conn. 651, 659, 193 A.2d 525. The record indicates no error in the foregoing rulings.

As far as appears, the same rules were applicable to the question excluded in the cross-examination of the witness Kamlani as to whether he relied on any legal advice given him by the defendant.

### (b)

The finding discloses no error in the court's admission, on the plaintiff's redirect examination of Kamlani, of a question as to whether, in conversations with Dacey which had been brought out in Kamlani's cross-examination by the defendant's counsel, Dacey had advised Kamlani as to the tax consequences of a will which Dacey had prepared for the witness.

The basic function of a redirect examination is to enable a witness to explain and clarify relevant matters in his testimony which have been weakened or obscured by his cross-examination. *Bredow* v. *Woll,* 111 Conn. 261, 264, 149 A. 772; 4 Jones, Evidence (5th Ed.) § 907, p. 1697; 58 Am. Jur., Witnesses, § 562. Although the court has a liberal discretion, it should not ordinarily permit explanation or clarification of collateral matters, immaterial to the outcome of the case, since it would be

a mere waste of time. *Sullivan* v. *Nesbit,* 97 Conn. 474, 477, 117 A. 502. Nor should it ordinarily allow on redirect examination a question covering a matter not touched upon or weakened in the cross-examination. So to do is to allow the redirect to amplify or repeat the direct testimony. *Tappan* v. *Knox,* 115 Conn. 508, 518, 162 A. 7. But the court has discretion, even on redirect examination, to permit explanation or clarification of evidence given on the direct examination although not touched upon in the cross-examination. *Tappan* v. *Knox,* supra; *Dennehy* v. *O'Connell,* 66 Conn. 175, 181, 33 A. 920; *Plumb* v. *Curtis,* 66 Conn. 154, 167, 33 A. 998. There is nothing in the finding to indicate that the court abused its discretion in admitting the question or that the question covered a matter not weakened or obscured by the cross-examination.

### (c)

The court admitted in the plaintiff's case in chief two letters from the defendant to Sara L. Browne. These letters were claimed to tend to show that the defendant had charged Mrs. Browne's son, Malcolm, for legal services. One letter states, in relevant part, that the defendant prepared "a detailed estate plan for . . . [Malcolm]" and "sent him a modest bill for professional services". It further states: "I expect to be paid for my services." The letter also recalled that the defendant devoted a day to reviewing the financial programs of Sara and Malcolm. He did prepare a will and trust for Malcolm. The letter tends to show that the defendant billed Malcolm for the service of preparing a detailed estate plan. Whether this did or did not include a charge for services in preparing the will and trust does not clearly

appear. The other letter makes a short reference to the defendant's "disagreement with Malcolm about the bill." Although the court might well have excluded both letters on the ground that their relevancy was too obscure, we cannot find harmful error in their admission, even though nothing clearly connecting the demand for payment with the preparation of the will or trust, as such, appears in the finding. Whether the defendant directly charged his customers for preparing wills and trusts, as such, is of no consequence since, as previously pointed out, he did it for compensation. Indeed, the public may well be in greater need of protection from the unauthorized practice of law where it seems to be done without charge than where a charge is openly made for the services. In the former situation, the public, through natural cupidity, are the more readily attracted to something which appears to be a "giveaway" project or a chance to obtain "something for nothing." Since specific, or direct, unit compensation for the will or trust, as such, was immaterial, and since the compensation to be derived from the sales of Wellington Fund shares to Malcolm's trustee was provided for in the trust arrangement, the defendant has shown no harmful error in the rulings admitting the exhibits.

### (d)

The plaintiff, during its case in chief, offered in evidence an advertisement inserted in The Bridgeport Post for Thursday, April 9, 1964, indicating, inter alia, that the defendant claimed to be an expert on trusts and wills. The defendant objected to its admission as irrelevant to the instant proceeding. The injunctive relief sought was to

be granted, if at all, on the situation existing at the time of the trial. The court could properly admit the exhibit under this rule. *Labbadia* v. *Bailey,* 152 Conn. 187, 192, 205 A.2d 377.

### (e)

The other evidential rulings complained of relate to the cross-examination by his own counsel of the defendant, who had been called as a witness by the plaintiff in its case in chief. Since Dacey was a party adverse to the plaintiff, he came within the provisions of General Statutes § 52-178, as construed in *Mendez* v. *Dorman,* 151 Conn. 193, 197, 195 A.2d 561.

After the plaintiff had completed its statutory direct examination of the defendant, he was cross-examined by his own counsel, who elicited the fact that he had arrangements with certain banks throughout the state whereby they would act as trustee of a "Dacey trust" at a fee less than the usual 3 percent of the ordinary income. He was then asked what arrangements he had with these banks. Upon inquiry by the court and the plaintiff's counsel as to the materiality of the question, the defendant's counsel claimed that the answer would be indicative of the type of service the defendant was rendering clients "in fulfilling this estate planning scheme that he has developed". The evidence was excluded. As far as it was indicated in the finding, this was another attempt to cross-examine on matters not covered in the direct examination. *Duncan* v. *Milford Savings Bank,* 134 Conn. 395, 403, 58 A.2d 260. This is not permissible under our rule, which applies regardless of whether the direct examination is the ordinary one or, as was the case here, a statutory direct examination

of an adverse party. *Martyn* v. *Donlin,* 151 Conn. 402, 406, 198 A.2d 700. This being so, the question was also objectionable as an attempt to put in the defendant's case out of order. *Shulman* v. *Shulman,* 150 Conn. 651, 659, 193 A.2d 525; *Finch* v. *Weiner,* 109 Conn. 616, 619, 145 A. 31. On each ground the ruling was correct.

The defendant's counsel also attempted to elicit testimony on the cross-examination of the defendant as to his efforts to work out with the officers of the Connecticut Bar Association a less objectionable method of conducting his business. This testimony was claimed on the ground that it would tend to show the defendant's good faith in conducting his business. If this testimony was relevant at all, it does not appear to have been within the scope of the direct examination. Unless it was, it would appear to have been part of the defendant's case in chief. It was properly excluded on the two foregoing grounds.

For the same two reasons, the court was not in error in excluding a question asked the defendant on cross-examination by his own counsel as to whether he was licensed under state or federal law to act as an investment counselor or a salesman of stocks and bonds. This question was claimed by the defendant's counsel on the ground that the answer would tend to show what the defendant's business really was. The finding does not indicate that this subject had been covered in the direct examination, and, consequently, if admissible at all, this testimony would have been part of the defendant's case.

The same ruling was properly made excluding a question asked the defendant on cross-examination by his own counsel as to whether he was registered

with the Securities and Exchange Commission.

On the same grounds, the court's exclusion of the defendant's "sales kit", claimed to show his "entire business operation", was proper.

There was no error in the rulings on evidence.

## IV

Although the defendant's counsel left no stone unturned in his client's behalf, Dacey's activities present a sordid picture. Dacey issued and distributed the booklet praising his own expertise in devising the trust arrangement comprising the Dacey trust and the implementing will and advising as to the legal advantages to be gained from adopting this trust arrangement. After clients had been persuaded to adopt the Dacey trust arrangement, Dacey prepared trusts and wills adapted to their needs and desires, providing for large potential profits for himself in the sale of Wellington Fund shares, on which he received a 6 percent commission. For the reasons already pointed out, these activities involved the practice of law and, as such, were in violation of General Statutes § 51-88.

There is no error.

In this opinion the other judges concurred.