WILLIAM KATZ *v.* KENNETH L. BRANDON ET AL.

KING, C. J., HOUSE, COTTER, THIM and RYAN, Js.

522

Argued April 3—decided June 5, 1968

*Igor I. Sikorsky, Jr.,* for the appellant (plaintiff).

*Armand A. Korzenik,* for the appellees (defendants).

RYAN, J.  The plaintiff brought this action for a declaratory judgment against the defendants named individually in their capacity as members of the Hartford Redevelopment Agency, hereinafter referred to as the agency, and against the members of the Hartford city council, the city of Hartford and the Olivetti-Underwood Corporation, seeking to determine the validity of a taking by eminent domain of land owned by the plaintiff.[1]  The action

---

[1] The plaintiff's prayer for relief seeks:  (1) a declaratory judgment;  (2) a permanent injunction restraining the agency from acquiring land of the plaintiff;  (3) a temporary injunction restraining the defendants from proceeding with those portions of the

arises from the approval by the agency of a redevelopment project which included within the area to be taken two parcels of land belonging to the plaintiff. The court determined that the action of the agency was proper, and the plaintiff has appealed, assigning as error that the approval of the redevelopment project was invalid because it was instituted for a private rather than a public purpose; that the plaintiff's right to due process was violated at a public hearing held on the project; and that the defendant Joseph V. Cronin, who participated in crucial deliberations and decisions concerning the redevelopment project, should have disqualified himself because of a conflict of interest.

Several of the plaintiff's assignments of error relate to the court's finding of facts. These assignments are not pursued in the plaintiff's brief and are therefore treated as abandoned. *Wood* v. *Wilton,* 156 Conn. 304, 305, 240 A.2d 904.

The court found the following material facts: On or about July 1, 1961, and for some years prior thereto, the plaintiff and his wife were the owners of a parcel of land known as 57 Laurel Street, and the plaintiff was the sole owner of property known as 67 Laurel Street, both parcels being located in the city of Hartford in a business I zone. A single-family residence on the latter parcel was occupied by the plaintiff and his wife.

Olivetti-Underwood Corporation, hereinafter referred to as Olivetti, is a corporation with a manu-

proposed project which affect the plaintiff's land; and (4) such other and further relief as to equity may appertain. The parties have stipulated before this court that, although an action for injunctive relief is not proper in this setting, the plaintiff may proceed with the appeal on the basis of his prayer for a declaratory judgment. The claims of all other interested persons have been settled.

facturing plant located in the Laurel Street area of Hartford. Sometime in 1958 or 1959, Olivetti was notified by the state highway department that land owned by Olivetti on Park Street, which was being utilized as an employee parking lot, would be condemned by the state highway department for use as part of interstate route 84, an east-west expressway. The area to be condemned involved 3.7 acres and accommodated approximately 700 employees' cars. Olivetti's officers informed various city officials of the possibility of the construction by Olivetti of a multiple-story garage in the area to be condemned if the city were to approve a redevelopment project. On or about February 2, 1962, a parcel of land approximately 171,160 square feet in area belonging to Olivetti was condemned by the state highway commission, and in due course an award of $708,800 was paid as compensation therefor, a price of approximately $4.14 per square foot.

Following the recommendations of the planning commission, the agency approved a project designated as the Underwood redevelopment area, which included some 33.3 acres of land within which were the parcels belonging to the plaintiff known as 57 and 67 Laurel Street, as well as land owned by Olivetti. The Underwood project was so named by the planning commission because Olivetti was the key industry and landmark in the area. Olivetti's first knowledge of the redevelopment project came from a letter from the planning commission, dated May 17, 1961, which was sent to Olivetti's vice-president along with an informational copy of a letter sent by the director of the planning commission to the director of the Greater Hartford Flood Commission.

Subsequently, the city of Hartford approached

Olivetti concerning Olivetti's interest in the acquisition of land in the vicinity of its factory, and, in negotiations and conferences with the city, Olivetti was invited to make known the needs of its plant in the area of redevelopment. In addition to Olivetti, other manufacturing concerns in the area were consulted by the city. Officers of plants in the vicinity attended meetings with the city at the city's request, and the problems of all of the industrial units in the area were thoroughly discussed.

The Underwood site is in an industrial area dating back to the Civil War period, and there are several manufacturing plants in the area including, along with Olivetti, other large industrial complexes engaged in international manufacturing businesses, such as Merrow Machine, Billings and Spencer, and Arrow-Hart and Hegeman. The Underwood area suffered flooding in 1936, 1938 and 1955. The planning commission was for a long time aware of conditions in the Underwood area, and in 1950 it included this neighborhood in an official map of areas suitable for redevelopment. Because of more serious problems existing in other sections of the city, however, no renewal action was planned for the area until 1961. The general plan adopted by the planning commission contains a map dated July 18, 1950, which shows the Underwood area as a potential redevelopment area.

Factors which brought the Underwood redevelopment to the fore in 1961 were its mixed residential and industrial uses resulting in housing facilities located close to factories, the periodic flooding in the area emphasized by the efforts of the Greater Hartford Flood Commission, and the construction of interstate route 84, which passed through the Underwood area. The first formal steps for rede-

velopment were taken in 1961, but, because of intervening procedures required by the federal government to enable the city to receive a grant of federal funds for the project, the city was not in a position to acquire the land until December, 1965. The city complied with all statutory provisions in connection with the Underwood redevelopment project, and the federal government recognized this compliance by authorizing a redevelopment contract with the city and by the giving of a federal grant of $1,600,000 and loans of considerably more money for the project. Both the agency and the city council passed resolutions making requisite findings that the area was suitable for redevelopment and approving the redevelopment plan to meet all state and federal requirements for a redevelopment project. It was found that the structures in the area were substandard and unsafe, that the facilities were inadequate, and that the conditions were unsuitable for a residential environment. It was further found that the conditions of the area were detrimental to the health, safety, morals and welfare of the community.

Although the city hoped that Olivetti would be a strong contender for project land for industrial expansion or parking, it was felt that the project was necessary with or without Olivetti's participation as a redeveloper. In January, 1962, Olivetti made an offer to the city to purchase 350,000 square feet of land in the redevelopment area at one dollar a square foot, but this offer was never acted upon or accepted by the city. At no time has Olivetti entered into any agreement with the city for the transfer to Olivetti of land, or title to land, in the redevelopment area. Olivetti does not have any agreement with the city for the acquisition of land in the rede-

velopment area, nor has it ever communicated any threat to the city to leave Hartford if land in this area was not furnished to it.

A redevelopment project such as the one approved by the agency requires a public notification of any intent or memorandum or understanding which would bind the agency and a redeveloper, the content of which must be advertised and made available to the public. There is a waiting period before the agency and the city council can consummate any redevelopment transaction. To execute an agreement for the disposition of land there must be a nominating or preliminary approval of the redeveloper by the agency, approval by the city council after a ten-day period, and final approval at a subsequent meeting of the agency. To be entitled to federal aid, the approval of the federal government is required as to price and also as to terms varying from a standard form before there can be a disposition of redevelopment land. No redevelopment contract has been prepared or signed with Olivetti or with any other party. The land is not cleared and is not available except for temporary parking. Such use is presently being made of some of the redevelopment land by several industries in the area including Olivetti. No price has been set or approved for disposition of land in the Underwood project. Olivetti's offer to purchase was not approved either formally or informally, and to the date of trial the city did not have any agreement, either pending or consummated, with Olivetti, nor had Olivetti indicated any concrete interest in a specific amount and a specific location in the redevelopment area.

A bond issue for the Underwood redevelopment project was passed by the city in November, 1961.

A public hearing on the project was held June 10, 1964, after proper legal notice. There was made available to the public in advance of the public hearing an agenda or summary of the redevelopment plan, or key parts of it. At the public hearing there were members of the public in attendance, including the plaintiff, and all persons who asked to be recognized were given a fair hearing and full opportunity to make their views known. At the public hearing, the plaintiff, who was accompanied by counsel, spoke more than once, and his counsel spoke frequently. The plaintiff sought to question the agency and its executive director concerning the Underwood redevelopment area and Olivetti's role in the project. The agency acted upon, and adopted, the Underwood redevelopment project at a subsequent meeting, held about a week after the public hearing.

The redevelopment agency is the city agency for the technical implementation of the policy directives of the city council. It passes on the merits or feasibility of a particular project before it, taking actions largely procedural, and it has no authority to change a project. When the Underwood project came to the agency, the determination that it be a redevelopment area and what the boundaries were to be had already been made by the city council. On August 28, 1961, when the city council referred the bond issue for the redevelopment project to a public hearing, the defendant Joseph V. Cronin was then a member of the council and voted in favor of the resolution. On September 11, 1961, Cronin resigned from the city council. As a member of the city council, Cronin did not participate in any vote dealing with the Underwood project other than the vote referring the bond issue to a public hearing, which

matter was purely routine and procedural. A public hearing was held on September 18, 1961, and the bond issue was approved by the voters of the city in November, 1961. The agency met on April 25, 1962, and approved preliminary surveys and plans for the project. On June 26, 1963, the agency met again with three members present, one of whom was Cronin. Cronin moved for the adoption and voted in favor of two resolutions authorizing the filing of an application for loans and for the preliminary approval of the renewal plan for the purpose of submitting it to the federal urban renewal administration. At the public hearing on the redevelopment project held by the agency, three of its members were present, one of whom was Cronin. On June 17, 1964, the agency met, and Cronin proposed a resolution approving the Underwood plan, which proposal was unanimously adopted. The agency met on December 2, 1964, and, with Cronin participating at this meeting, approved an agreement for the use of state funds for the project. With only three of its five members present, including Cronin, the agency met on February 25, 1965, at which time Cronin moved for the adoption of various motions pertaining to the Underwood project which were necessary for its implementation.

At the time of trial, the city of Hartford had acquired title to all of the properties within the Underwood redevelopment area, including the plaintiff's property, and had demolished all buildings with the exception of a few buildings which were in the process of being vacated. The property of the plaintiff in the Underwood area consisted of two noncontiguous parcels, each of 7500 square feet, out of a total project area of 1,454,400 square feet. The

property at 67 Laurel Street was a single-family residence with a garage devoted to a nonconforming use. The property at 57 Laurel Street was a single-family residence. There was nothing unique about either property. The plaintiff's property was naturally included within the physical dimensions of the Underwood area.

From these facts, the court concluded that the property acquired in the Underwood redevelopment project was for a public taking and not for private interests, that the public hearings and all steps taken in connection with the project were proper, that the plaintiff was not denied due process, that the defendant Joseph V. Cronin at all times acted in good faith and for the best interests of the community, and that Cronin had no conflict of interest.

The plaintiff claims that the agency and the defendants utilized the broad powers of condemnation conferred by statute for a private rather than a public purpose and that its actions were therefore invalid. Both the agency and the council passed resolutions making requisite findings that the area was suitable for redevelopment and approved the redevelopment plan to meet all federal and state requirements for a redevelopment project. A finding was made by the agency that the structures in the area were substandard and unsafe, that the facilities were inadequate, and that the conditions were unsuitable for a residential development and were detrimental to the health, safety, morals and welfare of the community. This decision is open to judicial review only to discover whether the agency has acted unreasonably, or in bad faith, or has exceeded its powers. *Graham* v. *Houlihan,* 147 Conn. 321, 328, 160 A.2d 745, cert. denied, 364 U.S. 833, 81 S. Ct. 70, 5 L. Ed. 2d 57; *State* v. *Fahey,*

147 Conn. 13, 17, 156 A.2d 463; *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 146, 104 A.2d 365; see McQuillin, Municipal Corporations (3d Ed. Rev.) § 32.25.

The plaintiff urges that the initial purpose of the agency was not to benefit the general public but to provide a private parking lot for employees of Olivetti at a price substantially below that which it would be required to pay in the open market, and that this was done to induce Olivetti to remain in the city of Hartford. "The Redevelopment Act contemplates that after an area is taken for redevelopment purposes some, or even all, of the land taken may be sold or leased to private individuals, referred to as redevelopers, even if they are not the original owners." *Gohld Realty Co.* v. *Hartford,* supra, 143; General Statutes (Rev. to 1966) § 8-137. It is, of course, essential that the taking be for a public purpose. "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. *McSorley* v. *Fitzgerald,* 359 Pa. 264, 270, 59 A.2d 142; 37 Am. Jur. 734, [Municipal Corporations,] § 120. Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and general welfare constitutes a recognized public purpose. 'If the expenditure of public funds will promote the welfare of the community, it is for a public purpose.' *Lyman* v. *Adorno,* . . . [133 Conn. 511, 517, 52 A.2d 702]. The modern trend of author-

ity is to expand and liberally construe the meaning of 'public purpose.' The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit." *Barnes v. New Haven,* 140 Conn. 8, 15, 98 A.2d 523; *Roan v. Connecticut Industrial Building Commission,* 150 Conn. 333, 344, 189 A.2d 399.

The Underwood location was under study as a possible redevelopment area from 1950 until 1961 prior to its being declared a renewal area. Factors which brought the Underwood redevelopment to the fore in 1961 were its mixed uses and housing close to factories, periodic flooding of the area, and the east-west highway. Because of these conditions, it was a natural renewal area to develop. "[I]n this day of keen competition to attract industry and business to a state or to a particular locality, public officials are expected to cooperate in helping an industry to locate in their community. They must be at all times alert in providing for future as well as present needs. See *Norwalk* v. *Connecticut Co.,* 89 Conn. 537, 547, 94 A. 988; *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 214, 83 A.2d 177; *Coppola* v. *New York, N.H. & H.R. Co.,* 143 Conn. 109, 112, 119 A.2d 730. . . . That some persons may derive a private advantage cannot defeat the public purpose of such an enterprise. *Berman* v. *Parker,* 348 U.S. 26, 33, 75 S. Ct. 98, 99 L. Ed. 27; *Barnes* v. *New Haven,* 140 Conn. 8, 14, 98 A.2d 523; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 106, 90 A.2d 862; *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702." *Peterson* v. *Norwalk,* 150 Conn. 366, 376, 377, 190 A.2d 33.

"If the public use which justifies the exercise of eminent domain in the first instance is the use of property for purposes other than slums, that same

public use continues after the property is transferred to private persons. The public purposes for which the land was taken are still being accomplished." *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 143, 104 A.2d 365.

There is nothing in the record to indicate that any conveyance of land has been made to Olivetti or that any agreement or understanding exists which would provide it with any advantage which is not available to others who may be interested as redevelopers. The conclusion of the trial court that the property acquired was for a public taking and not for private interests cannot be disturbed.

The plaintiff claims that the role of Cronin created a conflict of interest situation in that he participated in deliberations and decisions as a member of the council and as a member of the agency while at the same time serving as an agent of the labor union in the Olivetti plant. Cronin's activities as a councilman and as a member of the agency must be examined in the light of the facts found by the trial court concerning his position with the labor union and his relationship with Olivetti. He was business manager of the International Association of Machinists and Aerospace Workers for district 26, which had jurisdiction, with collective bargaining rights, over the unions existing at seventeen separate companies, one of which was Olivetti. He was neither an officer of the Olivetti shop committee nor a member of the executive board of the Olivetti union, and his only connection with the Olivetti union was to sit with its bargaining committee in an advisory capacity during contract negotiations. Included in the provisions of a contract entered into between the union and Olivetti in June, 1965, was a clause pertaining to relocation

and severance pay in the event that Olivetti should move from its Hartford location to another place more than thirty-five miles away. The international union had no reason to keep Olivetti in the city of Hartford and might prefer to have it move from the city so long as it remained within the union's jurisdiction. About half of the union membership lived outside of Hartford, with the union membership representing about 101 towns. A number of plants having collective bargaining rights with Cronin's union moved from the city of Hartford in recent years with the approval of the union, and there were numerous advantages and benefits to the union in having the employer move from an old plant in the city to a modern plant with adequate parking facilities. Cronin was a paid, full-time, elected employee of his union and was not an employee of Olivetti, and his employment would not be affected if there was no Olivetti union. The trial court concluded that Cronin would gain nothing, directly or indirectly, from his votes in connection with the Underwood project, that he acted at all times in good faith and for the best interest of the community, and that there was no conflict of interest on his part.

While personal advantage, pecuniary or otherwise, is one of the elements to be considered, it is not the only test, nor is the good faith of the public officer of controlling importance. "Public office is a trust conferred by public authority for a public purpose. *State ex rel. Stage* v. *Mackie,* 82 Conn. 398, 401, 74 A. 759. His status forbids the public officer from placing himself in a position where his private interest conflicts with his public duty. The good faith of the official is of no moment because it is the policy of the law to keep him so far from

temptation as to insure the exercise of unselfish public interest. He must not be permitted to place himself in a position in which personal interest may conflict with his public duty." *Low* v. *Madison,* 135 Conn. 1, 8, 60 A.2d 774; *Stocker* v. *Waterbury,* 154 Conn. 446, 454, 226 A.2d 514. The evil lies in the creation of a situation tending to weaken public confidence and to undermine the sense of security of individual rights which the citizen and property owner must feel assured will always exist in the exercise of public authority. *RK Development Corporation* v. *Norwalk,* 156 Conn. 369, 374, 242 A.2d 781; *Kovalik* v. *Planning & Zoning Commission,* 155 Conn. 497, 498, 234 A.2d 838; *Josephson* v. *Planning Board,* 151 Conn. 489, 493, 199 A.2d 690; *Daly* v. *Town Plan & Zoning Commission,* 150 Conn. 495, 500, 191 A.2d 250.

The plaintiff's claim that Cronin should have disqualified himself is predicated on the supposition that the redevelopment project was set in motion for the purpose of benefiting Olivetti. This theory assumes that Olivetti was an active participant, or had some important part, in the redevelopment project and might be expected to benefit therefrom. We have already indicated that there was no agreement or understanding between the agency and Olivetti which would provide it with any advantage which is not available to others who might be interested as redevelopers, and that the property acquired was for a public purpose and not for any private interest. The decision to redevelop the area was made in the public interest, and the interests of Cronin and Olivetti were neither greater than nor in any way different from the interest of any other citizen of Hartford. On the facts of this case, we can find no conflict of interest which would

reflect on, or interfere with, the performance by Cronin of his duty as a public officer. The conclusion of the trial court was correct.

The plaintiff makes the further claim that his constitutional rights were violated when he was denied the right to cross-examine members of the agency and its director at the public hearing held June 10, 1964, and that this constituted a denial of due process of law. The due process clause of the fourteenth amendment to the federal constitution, which has substantially the same meaning as article first, § 12, of the Connecticut constitution (now article first, § 10, of the 1965 Connecticut constitution), does not guarantee any particular form of state procedure. Due regard must be had to the nature of the proceeding and the individual right affected by it. The proceeding in the instant case under the provisions of § 8-127 of the General Statutes was to determine the need for the acquisition of private property for a public purpose and the extent of that acquisition. It required a legislative determination of fact and thereafter a determination of the amount of the damages for the taking. *Graham* v. *Houlihan,* 147 Conn. 321, 330, 160 A.2d 745, cert. denied, 364 U.S. 833, 81 S. Ct. 70, 5 L. Ed. 2d 57. Both the plaintiff and his counsel were permitted to speak at length in opposition to the approval of the plan. During the hearing, the plaintiff's counsel asked whether a redeveloper had been chosen to carry through with the project in the event of its approval and was informed that none had been chosen. He then asked whether there had been any discussions with any proposed redeveloper or whether the agency had any redeveloper in mind. He was told that there had been discussions with dozens of redevelopers and that the re-

mainder of the question was irrelevant. Later he was informed that no redeveloper had been selected and that Olivetti might be one of the possible redevelopers, along with other companies in the Underwood area. Counsel then asked if there was any commitment from Olivetti to build a multilevel parking project as a part of the redevelopment program and was informed that there was no commitment from anyone with respect to the project. It would appear that the plaintiff's questions relating to the plan were answered so far as it was possible for the members of the agency to do so at that time. The plaintiff was given a fair hearing and was not deprived of due process in this procedure.

The plaintiff also assigns error in two rulings on evidence by the trial court. The findings wherein the erroneous rulings are recited were not made in accordance with the provisions of Practice Book § 648. The obvious purpose of the rule is to enable this court properly to review the action of the trial court. A ruling on evidence must be tested by the finding. If it is claimed to be erroneous, the finding must contain facts sufficient to disclose the error. Practice Book § 648; *Grievance Committee* v. *Dacey*, 154 Conn. 129, 150, 222 A.2d 339; *Morgillo* v. *Evergreen Cemetery Assn.*, 152 Conn. 169, 175, 205 A.2d 368. The findings failed to disclose facts from which the materiality and the correctness of the rulings may be determined. *Casalo* v. *Claro*, 147 Conn. 625, 630, 165 A.2d 153. This inadequacy of the findings precludes our consideration of these assignments of error. *Schurgast* v. *Schumann*, 156 Conn. 471, 482, 242 A.2d 695.

There is no error.

In this opinion KING, C.J., and HOUSE and THIM, Js., concurred.

COTTER, J. (dissenting). I disagree with the portion of the opinion of the majority which finds no violation of the clear mandate of the rule enunciated in *Low* v. *Madison*, 135 Conn. 1, 60 A.2d 774. The *Low* case exhaustively reviews the rationale and history of the application of the principles promulgated therein concerning the disqualification of a public official. In that case we held (p. 10) that the action of a commission must not be "laid open to misinterpretation and suspicion." The question is primarily "one of public policy" and the "standard in public office [is primarily] measured by considerations of policy in which personal pecuniary interest" becomes secondary or incidental. The Connecticut rule of conduct is contrary to "the foundation of many of the reported decisions" from other jurisdictions. Id., 4, 5, 8. Even where there is a failure to show improper conduct, we have held that a set of circumstances which tends to create a distrust of a committee and a suspicion of unfairness violates the rule which requires disqualification, and it is better that no room be given for suspicion. *Greene* v. *East Haddam*, 51 Conn. 547, 559 (quoted in *Low* v. *Madison*, supra, 6). There is no imputation in the present case of any action which is dishonorable. On the contrary, I agree with the majority that the conduct was at all times in good faith. The Connecticut rule enumerated, however, is strict in its requirements, and, as stated, there must be no room in the case to cause the public to point with suspicion to circumstances which might create an aura of unfairness or partiality. The rule is based on public policy and not solely on conflict of interest. "Anything which tends to weaken . . . [public] confidence and to undermine the sense of security for

individual rights which the citizen is entitled to feel is against public policy." A "possible implication of disqualification" appears to be a sufficient basis for disqualification. *Low* v. *Madison,* supra, 9. This issue of disqualification of a public official and the criteria and principles enumerated in the *Low* case have recently been approved and reaffirmed in *Stocker* v. *Waterbury,* 154 Conn. 446, 453, 454, 226 A.2d 514.