**In re MID–AMERICA LIVING TRUST ASSOCIATES, INC., et al., Respondents.**

No. 77600.

Supreme Court of Missouri, En Banc.

Aug. 20, 1996.

**856**

John E. Howe, Carl Schaeperkoetter, Jefferson City, for Informant.

William R. Pearcy, Chesterfield, for Respondents.

PRICE, Judge.

This action was brought by the Chief Disciplinary Counsel (CDC) against respondents Mid–America Living Trust Associates, Inc., and Robert Dillie. The CDC seeks a declaration that respondents have engaged in the unauthorized practice of law and injunctive relief. The CDC has alleged, in particular, that respondents have: 1) rendered legal advice to individuals concerning the need for and advisability of various types of living trusts; 2) gathered information from individuals for use in determining what type of trust is appropriate and in preparing trust documents; 3) prepared trust documents for individuals; 4) prepared other legal documents including wills and durable powers of attorneys for individuals; and 5) that Mid–America charged and collected fees for these services.

This Court has the inherent authority to regulate the practice of law. Mo. Const. art. V, § 1. *In re First Escrow, Inc.*, 840 S.W.2d 839, 842 (Mo. banc 1992); *Reed v. Labor and Industrial Rel. Com'n*, 789 S.W.2d 19, 20 (Mo. banc 1990); *In re Thompson*, 574 S.W.2d 365, 367 (Mo. banc 1978).

**I.**

The parties have stipulated to the following facts. Mid–America is a closely-held Missouri corporation which prepares trusts, pour-over wills, durable and general powers of attorneys for individuals. Its president and 95 percent shareholder is Robert R. Dillie.

Mid–America works through trust associates that it defines as "independent contractors" to obtain clients. The trust associates are usually individuals with a financial planning business, insurance business, or stock brokerage business who have learned of Mid–America's services through education programs sponsored by Mid–America or advertising in trade publications. Trust associates may attend "Estate–Planning School", a training seminar put on by Mid–America, and all have signed a standard contract

agreement. The contract includes a clause instructing the contractor to "[n]ot give any tax or legal advice to clients; make, alter or discharge any wills or trusts, incur any liability on behalf of Mid–America Living Trust Associates."

The "trust associate" who recommends and sells a living trust also gathers personal and financial information from the client by completing a workbook provided by Mid–America. Clients may choose their own attorney or an attorney recommended by Mid–America who has agreed to review trust documents. If a Mid–America review attorney is selected by the client, the trust associate directs the client to make out two checks: one to Mid–America and one to the review attorney. The workbook and the checks are mailed to Mid–America.

Mid–America paralegals contact the client and verify the information in the workbook. The paralegals, based on input from in-house counsel, the review attorney, or personal experience, decide which form of trust would be the most appropriate and draft the initial documents from blank prototypes. The prototypes include forms for single and married persons in community and noncommunity property states. The marital trust prototype includes joint marital trust documents and separate trust documents. There are documents for estates having tax consequences and forms for pour-over wills, durable and general powers of attorney, health care declarations, and health care powers of attorney.

The trust documents, workbook, and attorney check are then mailed to the review attorney. The review attorney sometimes communicates directly with the client, but not always. The paralegal makes changes if directed to by the attorney. The documents are then mailed to the trust associate, who delivers the documents for execution by the client. Mid–America also provides assistance in retitling assets and preparing quitclaim deeds.

A majority of the 125 to 200 estate-planning packages prepared each month by Mid–America are for execution in Florida, Texas, Arizona, California, and Hawaii. Since its creation in 1989, approximately 250 trusts have been prepared by Mid–America for execution in Missouri. Mid–America has utilized three Missouri attorneys as review attorneys. The review attorneys have charged clients fees ranging from $100 to $250. The clients typically pay between $595 and $1,995 for Mid–America's services. Mid–America pays the trust associates a commission for each trust they recommend to Mid–America in accordance with a written schedule. A copy of this schedule was submitted to the Master as Exhibit C of the parties' stipulation and is appended to this opinion.

We derive other facts from the joint exhibits submitted by the parties. In the first page of the Training and Procedures Manual provided to all trust associates, Mr. Dillie "welcomes" Mid–America's trust associates to "our 'Family' of Associates" and encourages them "in [their] new business adventure—great success in the living trust industry." The manual and a training video alone, according to the manual, explain what a trust is, why trusts are beneficial, how to complete the estate plan, and, particularly, "how to make a successful sales presentation and close a sale." The manual explains how to fill out the workbook and gives a brief synopsis of the legal issues the client should be aware of when selecting a trustee, personal representative, conservator, guardian, or the person to designate as a durable power of attorney. The manual explains different ways to distribute property or exclude relatives from the trust, as well as other important information. Significant differences between state laws are also highlighted.

The manual tells the trust associates to encourage the clients to choose one of Mid–America's review attorneys:

Have your clients list the attorney of their choice—for obvious reasons we hope they choose our recommended attorney—on the line provided.

(In the bizarre instance where the clients want their own attorney, explain that the trust will have to be sent to that attorney

for review and they will be responsible for that attorney's fees, which could be substantially more than $100. If they persist, understand that this trust, if sent to their attorney, will very likely be canceled—since their attorney will probably offer to do the trust for them.)

The manual also instructs the trust associates not to share the name of the review attorney with the client unless they specifically request it, to avoid "any unlawful solicitation on behalf of the attorney." According to one of the trust associates questioned, the clients are instructed to make their checks out to "Review Attorney." The clients are instructed to sign an "Attorney Representation" form stating that the client recognizes "[a] potential conflict of interest between the Corporate Attorney's preparation of my/our estate documents and his representation of Mid–America exists and I/we consent thereto." The clients also sign a "Disclosure and Compliance" form which states that "I/We understand that the representative is not an attorney or certified tax authority, and I have been advised to consult an attorney and/or tax accountant for tax or legal advice."

## II.

The Honorable Floyd McBride, Circuit Judge, was appointed Master in this case. Judge McBride entered an extensive thirteen page Revised Report of Master, Findings of Fact and Conclusions of Law. Judge McBride's ultimate conclusion was:

> Your master finds that a permanent injunction is appropriate under all of the circumstances, particularly since Mid–America intends to continue doing trust business in this state and injunctive relief is necessary to insure that respondent's business practices comply with the clear rule of law established by this Court in [*State ex inf. Miller v. St. Louis Union Trust Co.*, 335 Mo. 845, 74 S.W.2d 348 (banc 1934)]. Further, reasons grounded in the public welfare call for strict enforcement of the subject statutes against unlicensed persons who engage in the "law business." *Miller, supra,* 74 S.W.2d at 359.

The undersigned master recommends that the conduct to be enjoined shall include:

1. The soliciting, counseling, recommending and selling of trusts to Missouri residents by Mid–America's nonlawyer agents, servants and employees;

2. The drawing, preparing or assisting in the preparation of trust workbooks, trusts, wills and powers of attorney for residents of this state by Mid–America's nonlawyer agents, servants and employees without the participation or direct supervision of a licensed attorney; and

3. The charging and collecting of fees for the services enjoined hereinabove.

The undersigned master further recommends that the information be dismissed as to Respondent Robert R. Dillie.

## III.

It is the responsibility of the judiciary to determine what constitutes the practice of law, both authorized and unauthorized. Mo. Const. art. V, § 1; *Reed,* 789 S.W.2d at 20. In exercising this responsibility, we recognize that:

> The duty of this Court is not to protect the Bar from competition but to protect the public from being advised or represented in legal matters by incompetent or unreliable persons.

*In re First Escrow,* 840 S.W.2d at 840 (quoting *Hulse v. Criger,* 363 Mo. 26, 247 S.W.2d 855, 857–58 (1952)). The consequences of incompetent representation are especially dangerous because they are often invisible for many years, but then cause great hardship and expense, such as when a deed, will, or trust is found to be ineffective or not to achieve the results originally intended. Accordingly, we seek to allow only those who have been found by investigation and examination to be properly prepared and skilled to practice law and who demonstrate that they conform to higher standards of ethical conduct necessary in fiduciary and confidential relationships. *Hulse,* 247 S.W.2d at 858; *In*

*re Thompson,* 574 S.W.2d 365, 367 (Mo. banc 1978).

The legislature has also determined that the unauthorized practice of law is a danger to the people of Missouri. It has made the "practice of law" and engaging in "law business" by unlicensed individuals a misdemeanor crime. § 484.020.[1]

The "practice of law" is defined as:

... the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court of record, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies. § 484.010.1.

The "law business" is defined as:

... the advising or counseling for a valuable consideration of any person, firm, association, or corporation as to any secular law or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to obtain or securing or tending to secure for any person, firm, association, or corporation any property or property rights whatsoever. § 484.010.2.

Although the "practice of law" includes acts done both in and out of court, "law business" in particular implies that a nonlawyer has "held himself out" in a business "by repeated acts" or "by the exaction of a consideration" in which he acts in the same capacity as a lawyer.[2] *Liberty Mut. Ins. Co. v. Jones,* 344 Mo. 932, 130 S.W.2d 945, 955 (banc 1939). These statutes are "primarily intended to protect the public from the rendition of certain services, deemed to require special fitness and training on the part of those performing the same, by persons not lawfully held to possess the requisite qualifications." *State ex inf. Miller v. St. Louis Union Trust Co.,* 335 Mo. 845, 74 S.W.2d 348, 357 (banc 1934).

This Court has attempted to maintain a "workable balance" in these matters between the public's protection and the desired efficiency and economic benefits that result from a competitive marketplace. We allow nonattorneys to perform routine services, ancillary to other valid activities and without compensation, such as the filling in of blanks in approved form real estate documents. *Hulse,* 247 S.W.2d at 862; *In re First Escrow, Inc.,* 840 S.W.2d at 846. Also, nonattorneys may sell *generalized* legal publications and "kits", so long as no "personal advice as to the legal remedies or consequences flowing therefrom" is given. *In re Thompson,* 574 S.W.2d at 369. The need for public protection demands the strictest scrutiny when the exercise of judgment and discretion is applied to the particular legal needs of an individual.

### IV.

The marketing and drafting of living trusts and other related legal instruments by nonlawyers is not unique to Missouri. It is a practice that has been the subject of substantial criticism by groups appearing before the Senate Special Committee on Aging,[3] 102d Cong., 2d Sess. (Sept. 24, 1992). It also has been the subject of criticism by legal com-

---

1. All statutory citations are to Missouri Revised Statutes, 1994.

2. In terms of these statutory definitions, the question presented is whether respondents have engaged in "law business". Other jurisdictions often use the term "practice of law" more inclusively than defined by § 484.010.1, and unless otherwise indicated, we also use the term "practice of law" to include "law business".

3. U.S. senators, state attorneys general offices, the National Council of the American Association of Retired Persons (AARP), the Federal Trade Commission, the American Bar Association, and a branch of the Better Business Bureau have openly criticized trust marketing companies, especially for targeting the elderly.

mentators. Trust marketing schemes have been rejected repeatedly by court decisions and state ethic opinions as the unauthorized practice of law.

Generally, critics argue three types of harm develop from trust marketing schemes by non-lawyers. First, unregulated solicitation by non-lawyers allows for abusive marketing practices, particularly aimed at the elderly. Second, there is no assurance of competency by non-lawyers. Third, a conflict of interest exists between those who benefit from the sale of a particular legal instrument and the client for whom that legal instrument may not be appropriate.

## A. Legal Commentators

Legal commentators have noted the high-pressure tactics and exaggerated benefits used to promote living trusts. Lori A. Stiegal, et al., On Guard Against Living Trusts Scams, NBA Nat'l B. Ass'n Mag., January/February 1994, at 20. Representatives solicit customers "by telephone, mail, newspaper advertisements, door-to-door, and in 'seminars' presented in hotels and restaurants." Charles F. Gibbs, The Marketing of Living Trusts by Non–Attorney Promoters, 20 ACTEC [American College of Trusts and Estate Counsel] Notes 193, 193 (1994); *see also People v. Volk*, 805 P.2d 1116 (Colo.1991) ("The salesmen sold the trusts door-to-door and at senior citizen centers."). "The public, particularly senior citizens, are told that the living trust is a cure-all for the problems entailed in asset management and wealth transfer, a claim with no more validity than the curative claim for snake oil." *Gibbs*, at 193; *see also People v. Laden*, 893 P.2d 771, 771 (Colo.1995) ("The nonlawyer who sold the trust told the couple it would cost their sons $65,000 to settle their estate through probate and the courts."); *Mahoning County Bar Ass'n v. The Senior Serv. Group, Inc.*, 66 Ohio Misc.2d 48, 642 N.E.2d 102, 103 (Bd. Unauth.Prac.1994) (Trust company recommended "that 'everyone' with an estate over $50,000 should have a living trust.").

The competency of non-lawyers to draft estate documents was questioned by Barlow

F. Christensen in his article, The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—Or Even Good Sense?, 1980 Am.B. Found. Res.J. 159 (1980). Although generally opposed to heavy regulation of the legal practice, Christensen acknowledged that "[p]roficiency in the field of estate planning requires knowledge of difficult and technical fields of law—estates, trusts, wills, and tax law—that may not be at the command of the average insurance agent .... most insurance agents have not had extensive further training, and as a general matter the competency of insurance agents in the drafting of estate plans would seem to be questionable at best." *Id.* at 206.

## B. Court Decisions

Court decisions from a number of states have addressed trust marketing endeavors by non-lawyers and consistently have found such activities to be the unauthorized practice of law. Courts have held that trust marketing companies and their employees practice law by advising and counseling clients that a specific type of estate plan or trust is needed and by preparing and drafting the necessary trust documents. Courts have found that attorneys participating in such schemes violate their ethical duties not to assist in the unauthorized practice of law and to avoid conflicts of interest. Courts also have noted actual harm to trust clients and the substantial fees charged. A brief summary of these decisions is in order.

### (i) Advising and Counseling

All courts that have addressed the issue have held that non-lawyer trust salespeople render legal advice and engage in the unauthorized practice of law when they recommend living trusts to specific individuals.

The thing that stands out like a mountain peak in all this accumulated mass of evidence is that business men are not lured into disposing of all control over their property, of embarking into unheard of schemes to escape personal liability, taxes, court costs, attorneys' fees, etc., until they

are assured by some reputed expert that the whole novel plan has been time-tested and found legally water tight. It cannot be doubted that the inducement for the so-called 'purchases' of this 'service' was legal advice, nothing else, and it makes no difference ... whether its representations were true or false.

*People ex rel. Dunbar v. Schmitt,* 126 Colo. 546, 251 P.2d 915, 916–17 (1952) (citing referee's report); *People v. Cassidy,* 884 P.2d 309, 311 (Colo.1994) (The company "was involved in the unauthorized practice of law by selecting one package as appropriate for its customers."); *The Florida Bar re Advisory Opinion—Nonlawyer Preparation of Living Trusts,* 613 So.2d 426, 427–28 (Fla.1992) ("[A] lawyer must make the determination as to the client's need for a living trust and identify the type of living trust most appropriate for the client."); *Comm. on Professional Ethics & Conduct of the Iowa State Bar Ass'n v. Baker,* 492 N.W.2d 695, 703 (Iowa 1992) ("[W]hether a living trust is appropriate in a given case calls for the exercise of independent professional judgment by a lawyer."); *Volk,* 805 P.2d at 1118 ("The respondent admitted that counseling and sale of the living trusts by nonlawyers constituted the unauthorized practice of law.").

The Board of Commissioners on the Unauthorized Practice of Law in Ohio has decided cases in accordance. *Mahoning,* 642 N.E.2d at 105; *Ohio State Bar Ass'n v. Martin,* 66 Ohio Misc.2d 15, 642 N.E.2d 75, 78 (Bd. Unauth.Prac.1994) ("[A]dvising and counseling residents of Ohio that a specific type of trust agreement would be suitable for their respective estates and should be established" constitutes the unauthorized practice of law. (citation omitted)); *Cleveland Bar Ass'n v. Yurich,* 66 Ohio Misc.2d 22, 642 N.E.2d 79, 83 (Bd.Unauth.Prac.1994) ("After the interview, the representative (rather than an attorney) determined if the person should have a living trust.").

Even if the advice is termed as a "suggestion" or the client is encouraged to consult his own attorney, courts have still found that financial planners or insurance salespeople cannot advise a client as to his or her specific need for a particular form of disposition without practicing law illegally. *Oregon State Bar v. John H. Miller & Co.,* 235 Or. 341, 385 P.2d 181, 183 (1963). "[W]hether the report takes the form of suggestions for further study or as a recommendation that the suggestions be subjected to further scrutiny by a lawyer, the fact remains that the client receives advice from defendants and the advice involves the application of legal principles. This constitutes the practice of law." *Id.* 385 P.2d at 182.

#### (ii) Drafting Documents

Courts have also consistently held that the drafting and execution of trust documents for a fee by non-lawyers constitutes the unauthorized practice of law. *The Florida Bar,* 613 So.2d at 427 ("[T]he assembly, drafting, execution, and funding of a living trust document constitute the practice of law."); *Baker,* 492 N.W.2d at 701 ("[O]ne who prepares legal instruments affecting the rights of others is practicing law."); *Grievance Comm. for the Bar of Fairfield County v. Dacey,* 154 Conn. 129, 222 A.2d 339, 349 (1966) ("[L]egal judgement is used in the adaptation of the form to the specific needs and situation of the client."); *Dunbar,* 251 P.2d at 920 (Non-lawyer was practicing law by advising clients to purchase trust documents and by preparing them).

Ohio's Board of Commissioners on the Unauthorized Practice of Law also has forbidden unlicensed laypersons from drafting trust documents. *Yurich,* 642 N.E.2d at 85; *Martin,* 642 N.E.2d at 78 ("[P]reparing and drafting trust agreements, deeds to real property for residents of Ohio, and the supervision of the execution of those documents in Ohio" by a non-lawyer constitutes the unauthorized practice of law (citation omitted)); *Stark County Bar Ass'n. v. Beaman,* 60 Ohio Misc.2d 17, 574 N.E.2d 599, 600 (Bd.Unauth.Prac.1990) ("[T]he trust agreements prepared by respondents, for a fee, significantly affect the legal rights of their clients" and therefore respondents' actions constitute the unauthorized practice of law.)

### (iii) Disciplinary Decisions

Court decisions have not only ruled upon the propriety of non-lawyers engaged in trust marketing efforts, they have also focused upon the role of attorneys. Licensed attorneys participating in such schemes have been disciplined for assisting in the unauthorized practice of law and for creating a conflict of interest.

By accepting referrals to draft trust documents sold or recommended by non-lawyers, courts have found attorneys have aided in the unauthorized practice of law. *Wayne County Bar Ass'n v. Naumoff,* 74 Ohio St.3d 637, 660 N.E.2d 1177, 1178 (1996); *Baker,* 492 N.W.2d at 702. Lawyers that review trust documents drafted by non-lawyers also have aided in the illegal practice. *Laden,* 893 P.2d at 772; *Cassidy,* 884 P.2d at 311; *Volk,* 805 P.2d at 1118; *People v. Macy,* 789 P.2d 188 (Colo.1990).

Referral attorneys, as well as in-house attorneys, also have been found to suffer from a conflict of interest. Obviously, an attorney's interests are divided by simultaneously working for a trust marketing company and attempting to represent the company's clients. *The Florida Bar,* 613 So.2d at 428; *Volk,* 805 P.2d at 1117 ("The respondent considered the corporation to be her client, not the individual purchasers of the trusts."); *Macy,* 789 P.2d at 189; *Matter of Pearce,* 246 Mont. 313, 806 P.2d 21, 22 (1990). However, attorneys who regularly receive referrals from trust marketing companies, without being directly employed by them, also have been found to suffer from a conflict of interest. An attorney's advice may be tainted by his desire to continue receiving referrals. *See* Rule 4–1.7(b); Rule 4–5.4(c); *Cassidy,* 884 P.2d at 310–12 (Attorney offered to write opinion letters for trust company and "exhibited a selfish motive."); *Baker,* 492 N.W.2d at 703 ("[T]he prospect of receiving additional referrals constituted the 'compromising influences' mentioned in EC 5–1" and therefore a conflict of interest existed.)

In *Baker,* a review attorney was disciplined for contracting away his independent judgment and becoming "merely a scrivener." *Baker,* 492 N.W.2d at 702. The non-attorney "controlled the whole process from the initial interview to the final meeting when the clients executed the documents in his office. He did so by recommending the living trust, the necessary tailored documents to effectuate it, and a lawyer who he believed would not counsel against his advice." *Id.*

### (iv) Inadequate Services and Fees

As previously noted, the principal reason for restricting the provision of legal services to licenced attorneys is the protection of the public. The harm that can result from trust marketing businesses is not merely theoretical, but has been addressed by courts. In *The Florida Bar v. Schramek,* 616 So.2d 979, 987 (Fla.1993), a non-lawyer was enjoined from marketing and drafting living trusts as well as other legal activities. In one instance he incorrectly prepared both the trust document and a quitclaim deed, forcing the heirs to probate the estate anyway to clear title to the property, costing the estate $6,650. *Id.* at 981. In another case he prepared a defective quitclaim deed, resulting in the subsequent loss of a buyer because good title could not be produced timely. The accompanying trust gave an inordinate amount of control to the individual trustees and lacked a provision explaining the effect of the death, disqualification, or resignation of a co-trustee, requiring a court to interpret the client's intent. *Id.*

In *People ex rel. MacFarlane v. Boyls,* 197 Colo. 242, 591 P.2d 1315 (1979), the Colorado Supreme Court suspended an attorney for aiding a company in the unauthorized practice of law. The company enrolled "students" to learn to set up "pure" trusts to allegedly reduce their taxes. The trusts had never been found effective in any court and the IRS publicly reported that the approach was "little more than an ill-conceived scheme to improperly avoid taxes which would not accomplish any of its objectives." *Id.*

In *People v. Laden,* 893 P.2d 771 (Colo. 1995), non-lawyers, who essentially operated

the corporation, gave excessively high estimates of probate costs to induce living trusts sales. One salesperson told a couple "that it would cost their sons $65,000 to settle their estate through probate and the courts" and succeeded in extracting $1,595 from them for a trust. *Id.*

At least one court has questioned the fees charged by the trust marketing companies. "Our experience with 'living trusts' teaches us that they may be a very poor substitute for probate. Unlike probate fees, the fees charged by nonlawyers ... who tout living trusts are not subject to court scrutiny. Lack of court scrutiny can easily lead to unnecessary and excessive fees." *Baker,* 492 N.W.2d at 703. A review of the fees charged in various cases indicates that trust marketers have much to gain by advising their clients to purchase living trust documents. *Laden,* 893 P.2d at 771 ($1,595); *Cassidy,* 884 P.2d at 311 ($1,395); *Yurich,* 642 N.E.2d at 84 ($500 per couple, $350 per person); *Baker,* 492 N.W.2d at 698 ($1,000 for funding the trust); *Volk,* 805 P.2d at 1117–18 ($400 to $500); *State ex rel. Fatzer v. Schmitt,* 174 Kan. 581, 258 P.2d 228 (1953) ($300 to $3,125).

## C. State Ethics Opinions

Generally, attorney participation in trust marketing endeavors are regulated by disciplinary rules. In Missouri, for example, Rule 4–1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests unless:

(1) the lawyer reasonably believes the representation will not be adversely affected;

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Rule 4–5.4(c) provides:

A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

Rule 4–5.5(b) provides:

[A lawyer shall not] assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

Most other states have similar, if not identical, rules of conduct. The following states, however, have specifically addressed trust marketing activities by the issuance of ethical opinions that forbid attorneys to aid or participate in such schemes: Michigan Informal Ethics Opinion, RI–191 (2/14/94) ("A lawyer may not establish a business wherein non-lawyer agents sell will and trust forms door-to-door ... This proposed business structure ... suggests that the non-lawyer will be actually giving legal advice and opinions on legal matters to the clients. Concerns about the proper supervision of non-lawyer employees, as well as about competent representation, confidentiality of client information, and conflicts of interest are also raised by the proposed business. This business as planned would also violate prohibitions against solicitation of legal business by an agent, and giving value to another for recommending a lawyer's services."); Maryland Ethics Opinion 92–48 (7/22/92) (A lawyer may not accept employment from an estate planning corporation. "Here, the lawyer is not engaged to use his own judgment as to whether the revocable trust is appropriate for the client, but to modify sample forms and essentially to reinforce the estate planner's conclusions regarding the client's needs.... [S]ince the lawyer's services are being recommended by an entity that will be remunerated only if the lawyer performs the services, he is less likely to critically analyze the client's need for the services since the lawyer's own interests in maintaining a good relationship with the corporation will come into play. Additionally, the arrangement violates the prohibition against sharing legal fees with a non-lawyer."); Oregon Ethics Opinion 1991–87 (7/91) (A "lawyer may not accept client referrals from [an estate planning service] in order to

help those clients transact business with the service. . . .");  West Virginia Ethics Opinion 92–03 (undated) ("A lawyer may not participate in a living trust marketing franchise where nonlawyer agents advertise and hold seminars on living trusts, and meet with prospective clients, at which time the client pays for the trust, and gather information and documents from clients to forward to a regional office located out-of-state where the sole function of the lawyer, whose fee is paid by the agents, is supervising the execution of the documents.");  *see also* Ohio Supreme Court Ethics Opinion 92–15 (8/14/92);  Illinois Ethics Opinion 91–10 (10/25/91);  Oregon Ethics Opinion 1991–87 (7/91);  Connecticut Ethics Opinion 91–12 (6/25/91);  Dallas [Texas] Ethics Opinion 1991–03 (1991);  Colorado Ethics Opinion 87 (7/14/90);  Oregon Ethics Opinion 523 (3/89);  South Dakota Ethics Opinion 88–4 (5/3/88).

### V.

■ The determination that Mid–America is engaged in the practice of law, or more technically, the "law business" as defined in § 484.010.2, is beyond serious dispute.  A brief review of the record supports each of the charges filed on this point.

### 1.  Mid–America Rendered Legal Advice to Individuals Concerning the Need for and Advisability of Various Types of Living Trusts.

Mid–America stipulated that its trust associates "recommended" trusts to clients.  One trust associate contacted preexisting clients "who he thought might benefit from having a living trust."  Another trust associate routinely discussed with his clients a number of estate-planning techniques and invited his clients to watch a living trust presentation tape given to him at one of Mid–America's seminars.  Trust associates who sold living trusts received substantial commission from Mid–America.  See attached Exhibit C. This is not a situation such as in *In re Thompson* where a generalized "kit" was sold.  Instead, specific individuals were solicited and Mid–America's trusts were recommended and sold to them for valuable consideration as estate planning devices.

Courts that have encountered marketing schemes similar to Mid–America's have determined that the "representatives" approaching the clients were rendering legal advice.  In *People v. Cassidy,* 884 P.2d 309, 311 (Colo.1994), living trusts were marketed to customers by insurance salesmen who explained "the availability and advisability of the living trust package."  The Colorado Supreme Court found that the customers "relied on the oral explanations and advice of nonlawyer salesmen."  *Id.*  In *Mahoning County Bar v. Senior Serv. Group, Inc.*, 66 Ohio Misc.2d 48, 642 N.E.2d 102, 103 (Bd. Unauth.Prac.1994), seminars were conducted, informing attendees of the benefits of living trusts.  "Independent representatives" were then sent to the potential clients' homes.  They "answered questions . . . and gave advice on the legal effects and ramifications of living trusts."  *Id.* at 104.

In *Cleveland Bar Ass'n v. Yurich,* 66 Ohio Misc.2d 22, 642 N.E.2d 79 (Bd. Unauth.Prac.1994), individuals were invited to a seminar explaining the benefits of a trust.  Once again, "representatives" were sent out to individuals to "provide advice to persons regarding the merits of a 'living trust' for those persons' specific circumstances."  *Yurich,* 642 N.E.2d at 81.  The Ohio Board found that "the representative rather than an attorney determined whether the customer should have a living trust."  *Id.* at 85.

Likewise in *Comm. on Professional Ethics & Conduct v. Baker,* 492 N.W.2d 695, 697 (Iowa 1992), clients were solicited through seminars and later approached individually by a salesperson.  The salesperson "advised them in particular about what documents they would need and how those documents would need to be tailored to meet their particular situation."  *Id.* at 702.  Eventually, the consultants and the clients would "reach a consensus as to which estate plan was best for the clients."  *Id.* at 697.  An attorney then was recommended to draft the docu-

ments. *Id.* The Iowa Supreme Court found that Baker had aided in the unauthorized practice of law by participating in a scheme where non-lawyers advised his clients regarding their legal rights. *Id.* at 702.

In specific reference to § 484.010.2, Mid-America advised and counseled clients regarding secular rights and law for a valuable consideration.

**2. Mid–America Gathered Information From Individuals for Use in Determining What Type of Trust Was Appropriate for Those Individuals and Preparing Trust Documents.**

Merely gathering information for use in a legal document does not necessarily constitute the unauthorized practice of law. See *Martin*, 642 N.E.2d at 79; *The Florida Bar*, 613 So.2d at 428. However, that is not all that the trust associates did here. The trust associates were required to help the clients fill out a workbook, a detailed questionnaire in which the client listed all their assets and made various legal choices. For instance, the client decided whether the durable power of attorney would be springing or immediate, which assets they wanted included in the trust, and who they wished to designate as trustee, executor, or guardian. The trust associates were provided a training manual that defined legal terms, delineated the duties of appointed persons, and emphasized important choices the client must make throughout the workbook. The trust associates were not merely collecting information to fill in standardized forms as otherwise might have been approved by *Hulse* and *In re First Escrow*. Instead, they also were giving legal advice to the clients about choices to be made and the legal effects of those choices.

In *Yurich*, as in the present case, "representatives" were sent to potential customers to aid them in preparing a "Confidential Personal–Financial Information Form". *Yurich*, 642 N.E.2d at 83. The questions related to "the identification and disposition of assets, the execution of a power of attorney, the making of living will declarations, selection of guardians for minor children, and selection of executors for a pour-over will." *Id.* The Ohio Board of Commissioners on the Unauthorized Practice of Law found:

> the representatives not only gathered information but also provided advice to living trust customers relative to their individual legal rights and responsibilities in trust, estate, and tax matters.

> These representatives answered customers' legal questions about living trusts, estate planning, and tax matters. This advice was unlawful, although the representatives informed the customer to consult an attorney. *Id.* at 85.

Again, in specific reference to § 484.010.2, Mid–America advised and counseled clients regarding secular rights and law for a valuable consideration.

**3. Mid–America Prepared Trust Documents for Individuals.**

In *Hulse* and *In re First Escrow*, we held that non-attorneys could properly fill in blanks in standard real estate forms when they performed such a service *without compensation* and ancillary to other valid duties. Mid–America does not fall within this exception. The documents sold are not standardized forms accepted generally within a particular business or industry, but propriety documents unique to Mid–America. Mid–America markets, drafts, and executes customized legal documents *for compensation.* This service is not ancillary to any other valid business, but is the end business itself.

In specific reference to § 484.010.2, Mid–America drew for valuable consideration a paper, document, or instrument affecting and relating to the client's secular rights.

**VI.**

Respondents assert two defenses that they claim absolve them of the unauthorized practice of law. First, they claim that they cannot be held responsible for any unauthorized practice of law because the acts complained of are acts of trust associates who are inde-

pendent contractors that they do not control. Second, respondents claim that the documents are prepared under the supervision of Mid–America's in-house counsel and are reviewed by an attorney selected by the client. Neither of these points, however, is persuasive.

## A. Independent Contractors

Respondents argue that Mid–America cannot be held responsible for the actions of the trust associates because the trust associates are not agents of Mid–America, but are actually independent contractors. Mid–America refers to the trust associates in their contract with Mid–America as "independent contractors," but this self-serving title is not conclusive on the issue. *Empson v. Missouri Highway & Transp. Comm'n,* 649 S.W.2d 517, 521 (Mo.App.1983).

The primary thrust of Mid–America's business is centered on the activities of its trust associates. The trust associates recruit Mid–America's clientele. They create the customer relationship and have almost exclusive contact with the customer for Mid–America. Mid–America gives the trust associates specific instructions on how the trusts are to be sold, how the workbook is to be filled out, and what information is to be given to the client.

Despite the fact that Mid–America's trust associates agree not to give any legal advice, that is precisely what Mid–America trains and encourages them to do. Mid–America offers an "Estate–Planning School" for the associates. According to Mr. Dillie, who is neither an attorney nor a college graduate, the trust associates are shown "how to do advance[d] estate planning." The advertising material for the training course states that "[t]he absolute best thing you can do for yourself and your business is to find out what is the best thing to do for your client!" The goal of the course is to train trust associates "for success in an extremely competitive market place." The course claims to teach trust associates estate-planning techniques and includes classes in marketing. The ad-

vertising material for the "school" refers to selling trusts and at one point touts how trust associates may "earn *huge* commissions" on generation-skipping transfers.

Mid–America's argument that in such a context it can walk away from responsibility for the actions of its trust associates because they are independent contractors and not agents is simply frivolous. The trust associates are clearly acting under the direction and control of Mid–America. We considered a nearly identical situation in *Amway Corp., Inc. v. Director of Revenue,* 794 S.W.2d 666, 671 (Mo.banc 1990), and stated:

> One may be a representative or agent for the limited purpose of soliciting sales without being an employee and without having the legal authority to enter into contracts on behalf of another. In the statutory context, the plain meaning of "representative" is simply one acting in the place of another. Webster's Third New International Dictionary 1926 (unabr. ed. 1966). Notwithstanding the disclaimer of agency in the application, Amway's distributors were clearly authorized to act on behalf of Amway in soliciting the sale of distributorships. In doing so, they were Amway's representatives.

## B. Attorney Supervision and Review

Respondents also argue that paralegals draft all documents under the direct supervision of Mid–America's in-house attorney and that a review attorney selected by the client makes certain that the documents are appropriate for the client. Apparently, respondents believe this review is sufficient to "cure" any unauthorized practice of law. In reality, any mitigating effect the attorneys might have comes too little and too late in the marketing scheme.

### (i) In–House Counsel

Mid–America notes that the paralegals drafting the trusts are directly supervised by in-house counsel. However, the in-house counsel is employed by Mid–America, not the

client, and has a direct conflict of interest.[4] In *In re Escrow*, we specifically prohibited in-house attorneys from providing legal services to their employer's clients. *In re Escrow*, 840 S.W.2d at 848; *see also The Florida Bar*, 613 So.2d at 428 (There is also "a potential conflict of interest for a lawyer employed by a corporation or other entity involved in the sale of living trusts.... If the lawyer is employed by the corporation selling the living trust rather than by the client, then the lawyer's duty of loyalty to the client could be compromised."); Connecticut Ethics Opinion 91–12 (6/25/91) ("A lawyer who is employed by a corporation that markets financial planning services may not represent customers and give them legal advice pertaining to their purchases of the services.").

### (ii) Review Attorney

Likewise, the review attorney cannot "cure" Mid–America's unauthorized practice of law for three reasons. First, and most obviously, the review attorney enters the picture too late. Mid–America's non-lawyer trust associate has already given legal advice to the client regarding the client's legal affairs, recommended and sold a trust instrument, and received valuable consideration. Mid–America also has drafted a custom document tailored to the client's particular needs, prior to the participation of the review attorney.

This Court addressed the effectiveness of review attorneys in an almost identical situation in *State ex inf. Miller v. St. Louis Union Trust Co.*, 335 Mo. 845, 74 S.W.2d 348 (banc 1934), where a trust company was found to have illegally practiced law by drafting wills and trusts. As in the present case, the company's employees advised their clients to consult an outside attorney, and if they did not have their own attorney, the company would recommend one to them. *Id.* 74 S.W.2d at 352. This Court found that the "mere per-

functory approval of supposedly disinterested counsel" does not cure the fact that interested non-lawyers had prepared trust documents and warned that participation in such a scheme by an attorney might endanger their license to practice in this state. *Id.* at 360.

Second, participation by review attorneys in Mid–America's trust marketing businesses violates the rules of conduct for the legal profession and, therefore, cannot cure the unauthorized practice of law. See Rule 4–5.4(c); Rule 4–5.5(b). Recent opinions from Colorado, Iowa, and Ohio have confirmed that attorneys reviewing or drafting legal documents recommended or drafted by non-attorneys are aiding in the unauthorized practice of law or working with a conflict of interest.

For example, in *People v. Laden*, 893 P.2d 771 (Colo.1995), the Colorado Supreme Court disciplined an attorney for reviewing living trust documents sold and prepared by non-lawyers. Non-lawyer salesmen informed customers that for $125 Laden "would review the living trust and be available for a thirty-minute consultation to discuss the concept of the living trust, including whether their arrangement with [the trust marketing company] was to their advantage. The nonlawyer also advised the couple they were not obligated to use the respondent's services." *Id.* at 772. The court found that "[b]y agreeing to accept referrals from a nonlawyer engaged in the unauthorized practice of law under the circumstances here, the respondent aided that nonlawyer in the unauthorized practice of law...." *Id.*

In *People v. Cassidy*, 884 P.2d 309 (Colo. 1994), insurance agents sold living trust packages and informed the customer that for $100 an attorney would review the documents and issue an opinion letter. As in the present case, if the customer was interested, they would write one check to the company

---

**4.** Even if this type of conflict can be waived, an issue which we specifically reserve, the conflict waiver signed by Mid–America's clients is ineffective because the record does not reflect that it was given after consultation and full disclosure of the potential risks. Rule 4–1.7; *State v. Ross*, 829 S.W.2d 948, 952 (Mo.banc 1992).

and another to the attorney. *Cassidy,* 884 P.2d at 311. The Colorado Supreme Court again found that "[b]y permitting his name to be associated with the living trust packages, even if only by the oral representations of the salesmen, and by preparing opinion letters advising that the trusts were valid" the attorney aided a non-lawyer in the unauthorized practice of law. *Id.* The court also found that the attorney had received improper referrals. *Id.*

In *People v. Volk,* 805 P.2d 1116 (Colo. 1991), another Colorado case, unlicensed salespeople sold living trusts and the respondent attorney "reviewed the completed trust, ensured that the information in the trust was consistent with the application, and directed any necessary corrections. The respondent then signed a form letter addressed to the individual purchaser, and enclosed the final trust document and related quitclaim deeds, along with instructions on how the trust should be implemented." *Id.* at 1118. The attorney received $50 for each trust reviewed. *Id.* at 1117. The court found that "[i]n reviewing the living trusts here, the respondent aided a nonlawyer in the unauthorized practice of law, contrary to DR 3–101(A)." *Id.* at 1118.

In *People v. Macy,* 789 P.2d 188 (Colo. 1990), an attorney "reviewed several 'living trust' packages prepared for individuals and answered questions addressed to him by non-lawyer salespersons regarding individual customers' concerns." *Macy,* 789 P.2d at 188. Macy received $75.00 an hour for his services. *Id.* The Colorado Supreme Court disciplined Macy. "Aiding a nonlawyer in the unauthorized practice of law is a violation of a duty owed to the legal profession." *Id.* at 189.

Courts have even disciplined attorneys for aiding a non-lawyer in the unauthorized practice of law when the attorneys drafted the documents themselves. In *Comm. on Professional Ethics & Conduct of the Iowa State Bar Ass'n v. Baker,* 492 N.W.2d 695 (Iowa 1992), a certified financial planner recommended living trusts to Iowa residents, in hopes of being named and paid to fund the trust. *Id.* at 697. If the "clients" did not have an attorney to draft the trust documents, they were given a list of attorneys to consider and were told most clients chose Baker. *Id.* The Iowa Supreme Court disciplined Baker for aiding in the unauthorized practice of law and permitting a conflict of interest. Baker allowed the non-lawyer "to 'direct or regulate his professional judgment' in rendering legal services to the referred clients." *Id.* at 703 (citing DR 5–107(B)). The court found that "the prospect of receiving additional referrals constituted the 'compromising influences' mentioned in EC 5–1." *Id; see also Comm. on Professional Ethics v. Matias,* 521 N.W.2d 704, 707 (Iowa 1994) (Attorney unethically solicited business by allowing business cards to be distributed at living trust seminars.)

In *Wayne County Bar Ass'n v. Naumoff,* 74 Ohio St.3d 637, 660 N.E.2d 1177, 1178 (1996), a non-attorney operating a tax service asked the respondent attorney whether he could "refer estate planning matters to respondent. Respondent. then gave work sheets to [the nonlawyer] to gather data for preparing legal documents." The non-attorney had clients fill out the work sheets and forwarded the information to the attorney to draft the documents. In at least one particular instance, the attorney charged "never met personally, nor corresponded" with the client. *Id.*

In cases where the companies themselves were charged with the unauthorized practice of law, the drafting of the document by an attorney or attorney review did not "cure" the illegal activity. *See Yurich,* 642 N.E.2d at 85; *Mahoning,* 642 N.E.2d at 104.

Ethics opinions from state disciplinary authorities clearly warn attorneys that such conduct is actionable. Illinois Ethics Opinion 91–10 (10/25/91) ("A lawyer may not participate in an arrangement wherein a financial planning company gathers estate planning information from clients, advises clients as to which estate planning documents are appropriate, drafts the documents, and then for-

wards the documents to the lawyer of the client's choice for his review and execution. Such an arrangement violates the rules on aiding in the unauthorized practice of law, fee division with non-lawyers, conflicts of interest, and professional independence."); Oregon Ethics Opinion 1991–87 (7/91) ("The lawyer may not accept client referrals from [an estate planning service] in order to help those clients transact business with the service...."); Colorado Ethics Opinion 87 (1990) ("A lawyer may not participate in arrangements where non-lawyers are involved in the preparation and marketing of estate planning documents if the arrangements involve the unauthorized practice of law, fee-splitting or partnership with a non-lawyer, improper solicitation, compromised professional judgment, breach of confidentiality, or incompetent service. These concerns arise in contexts ... wherein non-lawyers solicit customers, schedule appointments for preparation of living trust packages with lawyers, assist with nonlegal funding tasks, and take fees ... under a plan in which a client pays one fee to the lawyer and a separate fee to the non-lawyer for nonlegal services."); Oregon Ethics Opinion 523 (3/89) ("A lawyer may not enter into an agreement with a corporation that markets an estate planning service where the corporation provides estate planning forms, consults with customers, and offers recommendations and legal advice and the lawyer simply reviews and executes documents prepared by the corporation. Such an arrangement violates the rules on aiding in unauthorized practice of law and on interference with the lawyer's independent professional judgment."); *see also* Michigan Informal Ethics Opinion RI–191 (1994); Maryland Ethics Opinion 92–48 (7/22/92); Ohio Supreme Court Ethics Opinion 92–15 (1992); West Virginia Ethics Opinion 92–03 (undated); Connecticut Ethics Opinion 91–12 (6/25/91); Dallas [Texas] Ethics Opinion 1991–03 (1991); South Dakota Ethics Opinion 88–4 (5/3/88).

Finally, although Mid–America claims to welcome independent review of its documents, it actually instructs its trust associates to avoid review by truly independent attorneys, and to encourage clients to choose an attorney from Mid–America's approved referral list. The Mid–America Training and Procedures Manual states:

> Have your clients list the attorney of their choice—for obvious reasons we hope they choose our recommended attorney—on the line provided.
>
> (In the bizarre instance where the clients want their own attorney, explain that the trust will have to be sent to that attorney for review and they will be responsible for that attorney's fees, which could be substantially more than $100. If they persist, understand that this trust, if sent to their attorney, will very likely be canceled—since their attorney will probably offer to do the trust for them.)

The manual also reminds the trust associates:

> The choice is the client's—your recommendation has to be unsolicited! That means you cannot say *"I think you should use Mid–America's recommended attorney ..."* but instead reiterate what the form states: If you do not have an attorney who specializes in Estate Planning, Mid–America will be happy to recommend several attorneys who are familiar with Mid–America's Estate Plans.

> \*    \*    \*    \*    \*    \*

> After the clients make the decision to use one of our recommended attorneys, or even ask for Mid–America's recommendation—THEN, you can commend the clients on a wise decision. But they have to make that decision first. If after reading the first paragraph, they would ask you a question such as "How much would my own attorney charge for this?" You can quite candidly reply *"Who knows?! All I know is that Mid–America's recommended attorney is already familiar with the documentation and that is one of the reasons he (or she) can efficiently represent you for the reasonable fee of $100."* (Emphasis in original).

Mid–America appears to discourage individualized contact between the client and their recommended attorneys as well. Although the parties have stipulated that the independent contractor provides the names of Mid–America's review attorneys to the customer, the stipulated exhibits admitted in this case lead to a different conclusion. The manual states that "we do not give them the name of the attorney unless THEY request it," purportedly to avoid attorney solicitation. One trust associate interviewed indicated that "[t]he instructions from Mid–America were to make the attorney check payable to 'Review Attorney'", and not directly to the attorney chosen. Mid–America further stipulated that "[r]eview attorneys sometimes, *but not always*, communicate directly with the clients." (Emphasis added.)

A brief review of the testimony of one of Mid–America's review attorneys, Laura E. Griesedieck, reveals the inadequacy of Mid–America's review scheme. Ms. Griesediek reviewed six cases referred to her, five of which she advised to seek a refund from Mid–America. Some clients needed more specialized legal advice than even Ms. Griesedieck could provide, let alone a trust associate. One family had a disabled son and needed to speak to an attorney who specialized in special needs trusts. Another client had a majority of his assets in IRAs and needed the advice of a tax attorney before making any decisions. One client refused to inform his wife of five illegitimate children, but still wanted Ms. Griesedieck to approve the trust despite the fact that problems could arise after his death.

In two other cases, her clients simply did not need a living trust. One family had a net worth of $73,000 and Ms. Griesedieck determined that they could avoid probate with a combination of beneficiary deeds, transfer-on-death titles on their vehicles, and pay-on-death designations on their checking and savings accounts. "I didn't feel they needed to spend eight hundred ninety-five dollars on estate planning." Ms. Griesedieck eventually

discontinued her relationship with Mid–America because many of her clients "didn't need living trusts, and I wasn't comfortable having clients constantly referred to me."

Although Ms. Griesedieck cannot be commended for participating in Mid–America's marketing practices, she can be commended for her independent advice to her clients and for discontinuing her relationship with Mid–America.[5] It is significant to note that five of the six trusts that Mid–America's trust associates recommended, gathered information on, and accepted payment for, were not appropriate for the individual client.

## VII.

The potential for harm and the actual harm caused by unlicensed persons advising individuals regarding their legal decisions and drafting living trusts outweighs any savings or additional service to the public that might be gained from Mid–America's operations. In accordance with our duty "to protect the public from being advised or represented in legal matters by incompetent or unreliable persons", we must enjoin Mid–America from soliciting living trusts through unlicensed agents in Missouri.

## VIII.

■ The Master found that Mr. Dillie could not be enjoined from the unauthorized practice of law along with Mid–America because the CDC did not produce any evidence that he had abused the corporate form and therefore could not be held personally liable for the corporation's actions. We disagree.

The focus of this type of proceeding is whether the unauthorized practice of law has occurred and whether the named parties have participated in the illegal activity. Through his authority as incorporator, president, 95 percent shareholder, and as a director of Mid–America, Mr. Dillie operated a business that engaged in the unauthorized practice of law. *See* §§ 351.310, 351.360. Further, Mr. Dillie directly participated in

---

**5.** The record does not reveal whether the clients' money was refunded by Mid–America.

the activities of Mid–America. Mr. Dillie made the initial contact with prospective trust associates; he was in charge of many of the seminars marketing the trusts and, despite a written price schedule, "Mr. Dillie is the one that really sets the prices" for the trusts, according to Mid–America's trust production supervisor.

Corporate officers, particularly those owning 95 percent or more of the stock, may not hide behind the corporate form to evade compliance with law or their responsibility when the law is broken. *See Schnucks Twenty–Five, Inc., v. Bettendorf,* 595 S.W.2d 279, 289 (Mo.App.1979). This is especially so if they participated in the evolution of the wrongdoing. *Rodgers v. Richmond Memory Gardens, Inc.,* 896 S.W.2d 64, 69 (Mo.App. 1995); *Honigmann v. Hunter Group, Inc.,* 733 S.W.2d 799, 807 (Mo.App.1987); *Boyd v. Wimes,* 664 S.W.2d 596, 598 (Mo.App.1984).

## IX.

Accordingly, we modify the recommendations of the Master and order that:

1. Mid–America and its non-lawyer agents, servants, employees, and trust associates cease soliciting, counseling, recommending, and selling trusts, wills, and all other legal instruments, for valuable consideration, to Missouri residents [6];

2. Mid–America and its non-lawyer agents, servants, employees, and trust associates cease drawing, preparing, or assisting in the preparation of trust workbooks, trusts, wills, and powers of attorney, for valuable consideration, for Missouri residents without the direct supervision of an independent licensed attorney selected by and representing those individuals;

3. Robert Dillie is enjoined from operating Mid–America, or any other form of business, or from aiding or assisting any other individual or form of business entity, in violation of the terms of this opinion and order; and

4. Costs are assessed to Respondents.

All concur.

**6.** The parties have not addressed whether employees of Mid–America may provide these services to individuals residing outside of Missouri and we reserve this issue.

# REVOCABLE LIVING TRUST COST & COMPENSATION SCHEDULE

| Value of Estate | Cost of a Living Trust Plan A | Associate Compensation for Plan A | Cost of a Living Trust Plan B | Associate Compensation for Plan B |
|---|---|---|---|---|
| Up to $200,000 | $995 | $400 | $1,095 | $ 400 |
| $200,001 to $400,000 | $995 | $400 | $1,395 | $ 500 |
| $400,001 to $600,000 | $995 | $400 | $1,695 | $ 650 |
| $600,001 to $800,000 | $995 | $400 | $2,095 | $ 800 |
| $800,001 to $1,200,000 | $995 | $400 | $2,695 | $1,250 |
| $1,200,001 to $3,000,000 | $1,695 | $650 | $3,695 | $1,700 |
| Over $3,000,000 | $2,395 | $850 | $3,695 | $1700 |

---

**Plan A Cost of Living Trust includes:**
- Revocable Living Trust Package for single person or married couple (may include separate trusts, one for each person, if required)
- Toll-free paralegal access.
- Free amendment to Trust within the first 6 months, $50 per amendment thereafter
- Retitling of one deed
- Complete sample funding package provided for client.
- Taxpayer identification number secured by Mid-America at the first death.
- Assistance to Successor Trustee for Trust distribution.
- Qualified Domestic Trust Provision

\* Attorney fee not included. Fee may vary by state

**Plan B Cost of Living Trust includes:**
- Revocable Living Trust Package for single person or married couple (may include separate trusts, one for each person, if required).
- Toll-free paralegal access.
- Free amendment to Trust within the first 6 months $50 per amendment thereafter.
- Complete retitling of ALL assets.
- Payment of ALL transfer fees by Mid-America
- Taxpayer identification number secured by Mid-America at the first death.
- Assistance to Successor Trustee for Trust distribution
- Qualified Domestic Trust Provision

\* Attorney fee not included. Fee may vary by state

*Clearly indicate on the Client Receipt in the Client Workbook which plan you are using - Plan A or Plan B.*

2/95