Memorandum of Decision
I. Facts
This case presents an attempt by the Commissioner of the Department of Children and Families ("DCF") to terminate the parental rights of Beatrice C. and Darrel S., who are the biological parents of Darlene C., born on January 1, 1994.[2]
The petition was filed on February 20, 1997. The child came into the care of the Department of Children and Families immediately after the child's delivery. The hospital authorities were concerned that Beatrice, the mother, who was then fourteen years of age, was essentially homeless and without visible means of support. The address which she provided to DCF workers was for an apartment occupied by other minor children. There were no responsible adults living at that address. It was January, and there was no heat in the apartment.
Beatrice, herself, had been a DCF committed child, living in foster care since 1988, when she was nine years old. On April 13, 1992, when Beatrice was thirteen years of age, she ran away from her DCF home. DCF made heroic efforts to try to get young CT Page 762 Beatrice to live in a shelter or a residential home, or to accept DCF services. Beatrice would move from one unsupervised setting to another, and she resisted all DCF efforts to stabilize her living conditions. She was between thirteen and seventeen years of age at the time.
In her testimony during the trial, she admits she was immature, stupid and didn't want to listen. "To be honest, I really haven't did anything to get my daughter back." She admits she made choices not to go for visitation. But now that she is eighteen, she says she is willing to accept DCF help.
The court finds that due to her consistent pattern of avoidant behavior, running around, failing to accept appropriate and timely services from DCF, and not visiting regularly with Darlene, Beatrice has no ongoing parent-child relationship with the child at the present time.
Darrel is the child's putative father. DCF social worker, Dan Ross, met with Darrel on January 4, 1994. Darrel was not sure whether he was the child's father or not. He was afraid that he might be charged with statutory rape, as he was twenty and Beatrice was thirteen when she got pregnant. He wanted a blood test and did not offer a plan for the care of the child. He had graduated from high school, became a tractor-trailer driver and was employed at the time. Beatrice says she saw Darrel a couple of months ago during 1997. She gave him the phone number of the foster mother taking care of Darlene. But Darrel has never called Darlene, has never visited her, has never sent her a card or a gift. He has completely abandoned the child.
Darrel was served with process regarding the initial order of temporary custody and the neglect/uncared for petition. He did not participate in any court hearings, nor did he contact the agency to inquire about the child's welfare. His court appointed lawyer challenged the DCF motion for blood testing and, on February 16, 1994, this court (Foley, J.) sustained the objection on the ground that in juvenile proceedings where the motion for blood testing is not accompanied by a verified statement by the child's mother, as is the custom in the usual paternity cases brought under Conn. Gen. Stat. § 46b-168, there must be a fact-based evidentiary hearing in order to satisfy due process before the blood testing can be ordered over the objection of the putative father. In re Daline C. N94003, Judicial District of Hartford-New Britain at Hartford, February 16, 1994, 11 CONN. L. RPTR. 91. CT Page 763 The petitioner, DCF, never subsequently requested an evidentiary hearing on the motion for paternity testing. DCF thereafter elected to essentially ignore the respondent father.
After the child had been in foster care for three years, DCF filed documents in the Superior Court for Juvenile matters to terminate the parental rights of Beatrice and Darrel.
II. The Verified Petition
In the case of In re Bruce R., our Supreme Court held that the termination of parental rights is governed strictly by statute, 234 Conn. 194, 201, 662 A.2d 107 (1995). The two statutes which authorize termination of parental rights, General Statutes § 17a-112 (a) and § 45a-715, require the case to be instituted by a petition. Practice Book § 1055.1 requires that "all juvenile hearings shall be initiated by and be in response to a petition . . . ." Practice Book § 1023.1.,Definitions Applicable to Proceedings on Juvenile Matters,
defines a petition as a "formal pleading, executed under oath alleging that the respondent is within the court's authority to adjudicate the matter which is the subject of the petition by reason of cited statutory provisions and seeking a disposition." (Emphasis added).
The petition for the termination of parental rights form, JD-JM-40, contains a space for the petitioner's representative to sign and for verification of the signature which reads: "subscribed and sworn to before me on . . . ." This expression, followed by the date and signature of the officer administering the oath, constitutes the jurat of an affidavit. 3 Am.Jur.2d,Affidavits § 16. The purpose of a jurat is to "hold accountable to charges of perjury those who falsely swear. In reL.M., 563 N.E.2d 999, 1001 (Ill.App. 4 Dist. 1990).
The document commencing the present action for termination of parental rights was prepared and filed by a Department of Children and Families social worker. In this case, the signature was not verified. It was not under oath. The signature block on the jurat was left blank. This petition was not commenced in accordance with the statutory and Practice Book requirements.
III. History of Similar Problems
This court has had a number of occasions to address problems CT Page 764 created by social workers preparing pleadings and petitions in child protection cases. In re Janie Marie W., Hartford-New Britain SCJM DN N-93-325 (November 9, 1993) was the first in a series of cases by this court highlighting the problems of social workers attempting to perform functions historically reserved to attorneys. In that case, the social worker, in drafting the petition, had pleaded "neglect" in a situation where the child had never been in the absolute care and control of the respondent-mother. The child had been removed by DCF directly from the hospital following delivery. In accordance with the decision of In re Kelly S., 29 Conn. App. 600 (1992), the only ground applicable was that the child was "uncared for", since the mother was unable to provide the specialized care which the child's physical, emotional or mental condition required. Since the DCF social worker had failed to allege that the child was uncared for in that the child had specialized needs that could not be met in the home, the petition was dismissed. DCF was required to start the case anew. The child remained in temporary care for additional time.
In the case of In re Sarah K. (January 28, 1997), this court again pointed out serious deficiencies in pleadings by DCF social workers.
 The judicially approved form for petition to terminate parental rights allows the petitioning individual or agency to check applicable boxes regarding grounds for termination. The petitioner again, did not make a good faith, critical analysis regarding which non-consensual grounds to allege in the petition. Accordingly, every possible ground for a contested termination of parental rights was alleged even though most of the grounds were inappropriate.
 While this practice may be understood by the lay social worker, unskilled in legal theory, as "covering all the bases," it is hardly an acceptable practice for an attorney and Commissioner of the Superior Court.[3] In re Sarah K., Id., 12.
The court did not grant the petition against either the mother or the father. In a third case eleven months later, in the case of In reCassandra B., (Nov 4, 1997), this court specifically raised again the problems presented by social workers filing petitions for termination of parental rights. First, the court pointed out the CT Page 765 seriousness of petitions to terminate parental rights as set forth in the case of In re Valerie D., 223 Conn. 492, 514,613 A.2d 748 (1992):
 [T]he termination of parental rights is defined, in General Statutes § 45-61b (g) [now § 45a-707 (g)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. Anonymous v. Norton, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294, 46 L.Ed.2d 268
(1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also In re Juvenile Appeal (83-CD),
[supra, 295] (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). (Internal quotation marks omitted.) In re Jessica M., supra, [217 Conn. 459, 464-65, 586 A.2d 597 (1991)].
"[T]his issue, created by a social worker performing legal work, that is, filing pleadings, is of particular concern in matters of such potential legal severity as the termination of all parental rights, which equally importantly, effects the validity of any subsequent adoptions, as well. There are hardly any more legally serious matters filed in any court, civil or CT Page 766 criminal. This court is deeply concerned that constitutional and statutory safeguards are not violated. `. . . [s]ince termination of parental rights is the ultimate interference by the state with the natural rights of parents with their children, resulting in an everlasting severance of the legal relationship and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards.' See also In reJuvenile Appeal (Anonymous), 181 Conn. 638, 640, 436 A.2d 290
(1980); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671,420 A.2d 875 (1979)." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986). In re Cassandra B., Id., 9-13.
This court then addressed the history of lawyers representing DCF:
"During the period of time prior to 1993, the agency had, by statute, lawyers assigned to it (General Statute § 17-445, later § 17a-47). It is understandable how the agency could, at that time, file its own petitions. But, in 1993, by virtue of Public Act 93-216, the agency's lawyers were transferred to the office of the Attorney General, thus placing the Commissioner in the same position as all other department heads, i.e., that of relying on the Attorney General to perform her legal functions. That statute now reads:
 There shall be a legal division which shall consist of attorneys-at-law assigned to each regional office of the department, who shall be assistant attorneys general on the staff and under the direct supervision of the Attorney General. Said division shall diligently prosecute petitions of neglect giving priority to petitions which allege child abuse as the grounds of neglect. The Department of Children and Families shall cooperate with such attorneys in preparation of their cases and shall render such assistance to them as shall be necessary to protect the best interest of the child named in the petition . . . . General Statute § 17a-47.
In re Cassandra B., Id., 12.
Most recently, in the case of In re Victor G. et al., (Nov. 12, 1997), this court granted the respondent's Motion to Strike. CT Page 767 The social worker who drafted the petition for termination of parental rights claimed the mother had abandoned her child. The child had been removed from the mother immediately after birth while in the maternity ward. The mother had a prior pending DCF case regarding a problem with another older child. The mother had been court ordered in a companion criminal case not to have any contact with any children under the age of sixteen. As a consequence of the no-contact with children order in the criminal case, DCF took the infant into custody from the mother immediately after delivery in the hospital. The social worker then initiated a co-terminous petition alleging, inter alia, that the mother had abandoned the infant.
 The basis of this claim seems to be, that since a criminal court entered an order preventing the mother from having contact with her then living children or any children under sixteen years of age, she should, in futurE, be prevented from caring for her newborn child. Whether the court (Damiani, J.) could possibly have contemplated this in his order, is unnecessary to resolve. Even if he did, which is unlikely, it is hardly imaginable that the State could enter an order preventing a parent from contact with her child and then use that same order as a basis for claiming that the child has been abandoned by the parent! Id.
This court finds that these examples of mistakes and inappropriate, if not improper, pleadings by social workers as illustrated in the above mentioned cases are regularly occurring with great frequency in juvenile court proceedings throughout the state. They have led to public harm in that A) they have delayed the proceedings; B) they have put the respondents, and the State, to unnecessary expense for lawyers, publication expenses and related costs of service; C) they have wasted available court time and staff resources; D) "[t]he time invested by [social workers] in preparing inadequate legal cases is time that could far better be spent improving their performance of the social service vocation for which they are trained;" The Florida Bar Inre Advisory Opinion HRS Nonlawyer Counselor 547 So.2d 909, 910
(1989), and; E) they have needlessly extended the already unacceptable time frame for permanent placement and adoption of children.
It is obvious that these pleadings and petitions filed in the CT Page 768 Superior Court, affect important rights of the child and parents.The Florida Bar re Advisory Opinion HRS Nonlawyer Counselor,518 So.2d 1270, 1272 (1988). "The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." (Citations omitted, internal quotation marks omitted.) Stanley v.Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551
(1972).
IV. Unauthorized Practice of Law
The issue raised by the defective petition in this case is whether social workers should be permitted to continue to file petitions in the Superior Court for Juvenile Matters. More specifically, the issue is whether the Commissioner of the Department of Children and Families, acting through her employees, performs acts in or out of court, which are "commonly understood to be the practice of law." Grievance Committee v.Payne, 128 Conn. 325, 330, 22 A.2d 623 (1941).
General Statute § 51-88 is one of the statutes which regulates the unauthorized practice of law in Connecticut.[4]
The statute provides for the court ". . . upon its own motion to restrain such violation". General Statutes § 51-88 (c). Accordingly, this court concludes that the agents of the Commissioner have been, and continue to be, engaged in the unauthorized practice of law. See The Florida Bar re AdvisoryOpinion HRS Nonlawyer Counselor 518 So.2d 1270 (1988); TheFlorida Bar re Advisory Opinion HRS Nonlawyer Counselor547 So.2d 909 (1989).
"Attempts to define the practice of law have not been particularly successful. The reason for this is the broad field covered. The more practical approach is to consider each state of facts and determine whether it falls within the fair intendment of the term." Grievance Committee v. Payne, supra, 329. The Supreme Court ". . . has consistently held that the preparation of legal documents is commonly understood to be the practice of law." Grievance Committee v. Dacey, 154 Conn. 129. 140-44, 229 A.2d 339 (1966). Statewide Grievance Committee v. Patton239 Conn. 251, 254, 683 A.2d 1359 (1996). It is, therefore, self-evident that determining the legal theory of a case, drafting the papers necessary to commence the legal action, checking the various possible legal grounds, signing the pleadings and submitting them to the court as a regular course of business CT Page 769 constitutes acts that are "commonly understood to be the practice of law." Here, these acts are done by social workers, not by the Attorneys General who are required by law to represent the Department of Children and Families.
In the court year September 1, 1994, to August 31, 1995, social workers filed petitions with the court for neglect, revocation or extension of commitments, and for termination of parental rights in 5,377 cases.[5] While it is the custom and practice of the Office of the Attorney General to file an appearance for the DCF Commissioner after the petition has been filed, it is the lay social worker who is required to exercise the ". . . high degree of legal skill and great capacity for adaptation to difficult and complex situations" State Bar Assn.v. Connecticut Bank Trust Co., 145 Conn. 222, 234-35,140 A.2d 863 (1958), that is required of the person drafting the petition to terminate parental rights.
"The [petitioner] is not trained in the law as an attorney. The preparation of legal documents involves "difficult or doubtful legal questions . . . which, to safeguard the public, reasonably demand the application of a trained legal mind." (Internal quotation marks omitted.) Baron v. City of Los Angeles,2 Cal.3d 535, 543, 469 P.2d 353, 86 Cal.Rptr. 673 (1970),Statewide Grievance Committee v. Patton, supra, 255. These social workers are performing a function that is, by every other state agency, reserved to the office of the Attorney General.
"The practice of law is open only to individuals proved to the satisfaction of the court to possess sufficient general knowledge and adequate special qualifications as to learning in the law and to be of good moral character. A dual trust is imposed on attorneys at law. They must act with fidelity both to the courts and to their clients. They are bound by canons of ethics which are enforced by the courts." State Bar Assn. v.Connecticut Bank Trust Co., supra, 234. The petitioner in this case, the Department of Children and Families, is not admitted to the practice of law in Connecticut, nor could it be since ". . . [o]nly a human being can conform to these exacting requirements. Artificial creations, such as corporations or associations, cannot meet these prerequisites and therefore cannot engage in the practice of law." Id., 234.
The statutes authorizing the Commissioner of the Department of Children and Families to file petitions in the Superior Court CT Page 770 do not specifically authorize social workers to do the legal work. Indeed, even if the statute had attempted to allow social workers to draft and file pleadings, the legislature could not authorize this. "[T]he General Statutes . . . [provide] that `[t]he superior court may admit and cause to be sworn as attorneys such persons as are qualified therefor, agreeably to the rules established by the judges of said court,' can be construed only as a legislative recognition of the inherent right of the Superior Court, a constitutionally established tribunal, to promulgate rules for the admission of attorneys. `It should be borne in mind that no judicial power is vested by the constitution in the General Assembly, either directly or as an incident of the legislative power, and the General Assembly cannot confer it'." Id., 231.
Indeed, the very language of General Statute § 17a-47
creating the legal division of the Attorney General's office requires the division to "diligently prosecute petitions of neglect, giving priority to petitions which allege child abuse as the grounds of neglect. The Department of Children and Families shall cooperate with such attorneys in preparation of their cases and shall render such assistance to them as shall be necessary to protect the best interest of the child named in the petition . . . ." The legislative mandate is clear: the attorneys general are to do the legal work with the assistance of the social worker.
In May 1996, The National Child Welfare Resource Center for Organizational Improvement, of the Edmund S. Muskie Institute at the University of Southern Maine, filed a report entitled State of Connecticut Court Improvement Project Report. The report was the work of an Advisory Council comprised of judges, Attorneys General, social workers, private members of the bar, executive branch officials and others. During 1995 and 1996, they worked with project members for the National Child Welfare Resource Center to make recommendations for improvements in the Superior Court for Juvenile Matters. Recommendation Sixteen of that report is that the Attorney General's Office should advocate for more resources for attorneys handling child protection matters. The report noted that the attorneys presently have insufficient time to spend with the case workers and, more importantly, they have insufficient time to process child protection cases. Id., 71-72.
This court is aware that the present staff of attorneys assigned to child protection cases is, as noted in the Court CT Page 771 Improvement Study, "stretched to its limit." But this court cannot sit back and permit the children of Connecticut to languish longer than necessary in foster care while overburdened DCF social workers file faulty pleadings in the Superior Court. See Juan F. v. O'Neill, Conn. Fed. Dist. Court (1991). The social workers have neither the skill, training, inclination nor authority to be performing legal work, especially in cases of such enormous legal import as the termination of a parent's rights. When done incorrectly, this practice undermines the entire concept of permanency planning and adoption of children. Abused and neglected children in Connecticut are beginning life at a monumental disadvantage. These children do not deserve substandard legal assistance. They need social workers delivering social services and lawyers delivering competent legal services that insure valid court proceedings which will withstand collateral attack.
V. Order
1. The present commitment of this child expires February 17, 1998. This child remains committed to the Commissioner of the Department of Children and Families.
2. The petition is dismissed without prejudice to reinstitute the petition properly.
3. The Commissioner of the Department of Children and Families is hereby ordered to cease and desist from the further unauthorized practice of law; to wit, filing petitions for the termination of parental rights in the Superior Court for Juvenile Matters, drafted, signed and filed by persons not admitted to the practice of law in accordance with rules established by the Judges of the Superior Court.
FOLEY, J.